[No. 3,406.]

## THE PEOPLE *v.* JOHN DEVINE.

IMPEACHING CREDIBILITY OF WITNESS.—Before the credibility of a witness can be assailed by proof of something he may have said elsewhere contradictory of the testimony as given, the witness must first be inquired of concerning it, and the time, place, and person involved in the supposed contradiction must be called to his attention.

IDEM.—A qualification of the rule governing the impeachment of witnesses by proof of contradictory statements elsewhere made by them is, that the matter involved in the supposed contradiction must not itself be merely collateral in its character, but must be relative to the issue being tried.

DEPOSITION BEFORE CORONER'S JURY AS EVIDENCE.—The deposition of a witness given before a Coroner's jury, and certified and returned by the Coroner to the District Court as required by the statute, is admissible in evidence for the purpose of contradicting the statement of the witness, made under oath, on the trial of the person accused of having murdered the deceased.

CORONERS.—A Coroner holding an inquest is in the performance of functions judicial in their character.

EVIDENCE IN CRIMINAL CASE. — Whenever, in a criminal case, the evidence offered by the defense is not plainly inadmissible, the better practice is for the prosecuting attorney to let it go in without objection.

APPEAL from the District Court of the Twelfth Judicial District, City and County of San Francisco.

The facts are stated in the opinion.

*G. W. Tyler*, for Appellant.

A deposition taken before a Coroner is prima facie proof of what the witness swore to before the Coroner. (2 Philips on Ev., 433; 1 Greenleaf on Ev., Sec. 517.)

The deposition was an official document. The Coroner has the power of a magistrate. He must take down the evidence of the witness in writing, and the law presumes he performed his duty. The deposition was therefore admissible to contradict the witness. (1 Greenleaf on Ev., Sec. 462; 14 Georgia, 185; *Wormley* v. *Commonwealth*, 19 Gratt, Va. 658; 3 Gray, 463; 17 Mass. 160; 4 Foster, N. H. 319; 22 Conn. 262.)

*D. J. Murphy*, District Attorney, and *C. B. Darwin*, Assistant District Attorney, for the People.

By the Court, WALLACE, C. J.:

The prisoner was convicted of the crime of murder in the first degree, in the felonious killing of one August Kamp, and being thereupon adjudged to suffer death, he brings this appeal from the judgment, and from an order entered denying his motion for a new trial.

It is alleged in the indictment that Kamp was murdered by the prisoner on the 15th day of May, 1871, at the City and County of San Francisco, by means of a pistol shot. Without attempting an extended outline of the voluminous testimony adduced upon the part of the prosecution, it is sufficient to say that the evidence by which it was sought to inculpate the prisoner was in the main, if not altogether, circumstantial in its character. The fact that Kamp had

been shot was directly proven; also, that he died of the wound, and that he was first discovered by Saragossa, a witness for the prosecution, at or near a place called Bay View, and in a wounded condition. It was shown that the deceased had, but a few days before his death, arrived in the city from the County of Contra Costa, where he had been engaged for several months in working upon a farm, in the employ of one Cheeney; that within these few days the deceased and the prisoner had appeared to be intimately associated, and had been often seen in company upon the streets and in the drinking saloons of San Francisco; that on the fifteenth of May they had gone together in a car over and beyond Long Bridge, to, or near to a place called Bay View; that the prisoner had shortly afterwards returned alone to the city, and that, at a later period in the day, the deceased had been found by Saragossa, suffering from the wound of which he afterwards died.

It was mainly upon these and a variety of other collateral facts and circumstances, more or less persuasive in their character, that the prosecution relied to establish by presumption the fact that the deceased had come to his death at the hand of the prisoner.

In the course of the trial, however, the prosecution examined one Mary Murphy as a witness, and she testified that on the sixteenth day of May (which was the next day after the shooting of the deceased had occurred), the prisoner admitted to her in a conversation then had between them, at her house at Union Place, in the City of San Francisco, that he had shot a man the night before *at Bay View.* It will be readily seen that this testimony, if credited by the jury, was of the utmost significance. It bore directly upon the very *factum probandum* in the controversy. Inasmuch as it was not pretended at the trial that any person other than the deceased had in fact been shot on the fifteenth of May at Bay View, the admission of the prisoner that he had shot

a man at that time and place, was, to all intents, and for all purposes, an admission that he had shot the identical person with the felonious killing of whom he was charged by the indictment.

An inquest had been held upon the body of Kamp, the deceased, by the Coroner of the City and County of San Francisco, with a jury sworn and impaneled pursuant to the provisions of the Act of April 19th, 1850 (Hitt. Genl. Laws, Sec. 723)—*concerning Coroners*—and at this inquest the witness, Mary Murphy, had been sworn and had testified concerning the same interview between herself and the prisoner, and the admission he had made to her on that occasion. In order to establish that her evidence before the Coroner was contradictory of her evidence as given at the trial, and so to impeach the credibility of her testimony, she was inquired of by the attorney for the defense as to what she had formerly stated upon that matter before the Coroner at the inquest. She was asked whether or not, in her statement made on that occasion concerning the interview between herself and the prisoner, she had said that the prisoner did not mention any locality or place as the locality or place at which he had shot a man. She answered that she had not so said on that occasion. The inquest returned by the Coroner and filed in the office of the Clerk of the Court below, and containing or purporting to contain the testimony of Mary Murphy, taken down under the direction of the Coroner, signed by the witness, by her mark and her signature, attested by the Coroner's clerk and certified by the Coroner himself, was then produced by the counsel for the prisoner and offered as evidence of the supposed contradiction. It appeared by this testimony as produced that the witness had detailed before the Coroner the particulars of the interview had at her house on the sixteenth of May between herself and the prisoner, and in connection therewith had stated as follows: "*He* (the prisoner) *said he had shot a man the night*

*before, but did not say where it was.*" Upon objection taken by the District Attorney, the Court below excluded the evidence of the alleged contradiction, and an exception was duly reserved to the ruling of the Court. The record does not disclose the point of the objection thus made and sustained by the Court below, nor are we informed, either by the bill of exceptions or the argument submitted here by the Assistant District Attorney, for what reason the offered evidence was so excluded by the Court. At a subsequent time during the trial the counsel for the defense called the Coroner and his clerk, and examined them as to the testimony given by the witness at the inquest, and as to the circumstances under which it had been reduced to writing and returned. They were each unable to state from independent recollection, even after looking at the return of the inquest, anything which the witness had testified before the Coroner's jury, or, in fact, that she had testified at all. The statement of the testimony of the witness appeared to be in the handwriting of the clerk, and to have been taken down by him in the method stated to have been uniformly pursued by Dr. Letterman while he was Coroner; that method was that the witness, being first duly sworn, was examined by the Coroner in the presence of the jury, and the answers given were repeated by the Coroner to the clerk, who thereupon wrote them down as given to him by the Coroner. Upon the conclusion of the examination of the witness the testimony taken down in this manner was read aloud for the purpose of correction in any particular desired, and was thereupon subscribed by the witness, and if subscribed by mark (as was the case with the testimony of Mary Murphy), was attested by the clerk. This method of taking testimony appearing to have been uniformly pursued by the Coroner and his clerk, and without—so far as they could remember— deviation in any instance whatever, her deposition before the Coroner was a second time offered to impeach the credi-

bility of her evidence as given at the trial, and was again excluded, this time "on the ground that the proper foundation therefor had not been laid."

The precise import of this objection, as appearing in the records before us, is not clear.

It is a settled rule prevailing in this Court, in the English Courts, and in those of nearly all the States of the Union, that where the credibility of a witness is to be assailed by proof of something he may have said elsewhere, contradictory of his testimony as given, the witness must first be inquired of concerning it, and the time, place, and person involved in the supposed contradiction must be called to his attention. When this has been done a foundation for a contradiction of the witness is said, in legal parlance, to have been laid; for these inquiries are necessary, "in order to found a contradiction," to quote the language of Mr. Starkie (page 241); and, of course, when there has been an omission to do this, it may be objected that *a proper foundation has not been laid.* We have thought to advert to this, because it did not seem to be a matter of the utmost familiarity to the Assistant District Attorney of the City and County of San Francisco, who represented the people on the oral argument here, and who, upon being inquired of by the Court, informed us that it seemed to him "as if the proper foundation had not been laid, to wit: *that the document* (the deposition of Mary Murphy) *was not shown to have been the genuine testimony of the witness;*" but added that he was wholly uninformed as to the real nature of the objection upon which it had been excluded by the Court below. In this condition of things we have been compelled, in our investigations of the case, to rely wholly upon our own researches, unaided by argument on behalf of the people, upon the question of law involved in the exclusion of the deposition of Mary Murphy.

1. A recognized rule, or rather qualification of the rule, governing the impeachment of the credit of a witness by proof of contradictory statements elsewhere made by him is, that the matter involved in the supposed contradiction must not itself be merely collateral in its character, but must be relevant to the issue being tried. We have already said that the effort made by the prosecution to establish by the testimony of Mary Murphy that the prisoner admitted that he had shot a man *at Bay View*, tended strongly, under the circumstances of the case, to the direct inculpation of the prisoner; and, we think, he had a right to impeach her testimony in that respect.

2. We are of opinion that a proper foundation had been laid upon the cross-examination for that purpose. Her attention had been distinctly called to the time, place, and person involved in the supposed contradiction, and she had been afforded an opportunity for explanation.

3. The only remaining question, therefore, concerns the competency of her testimony before the Coroner, when resorted to for the purpose of showing that, in point of fact, she had made statements at the inquest which were contradictory of her evidence as given at the trial, and upon this we think there can be no doubt. The testimony had been returned into Court as part of certain proceedings, judicial in their character, had before an officer appointed by law and expressly charged with the duty of reducing, or causing it to be reduced, to writing and returning it into Court. At common law, as well as under the statute of Edward I, and our statute concerning Coroners, which are but declaratory of the common law, the Coroner holding an inquest *super visum corporis* is in the performance of functions judicial in their character (*R.* v. *White*, 3 E. & E. R. 144; Rep. Const. Ct. So. Ca. 231; 32 Mis. R. 375); so distinctly judicial that he is protected under the principles which protect judicial officers from responsibility in a civil action brought by a

private person. (*Garnett* v. *Ferrand*, 6 Barn. & Cress. 611.)
Whether his proceedings be entered upon the Coroner's roll
at common law and the statute of Edward, or returned into
Court under our own statute, they amount to entries concern-
ing matters of public interest, made under the sanction of
an official oath and in compliance or presumed compliance
with the requirements of law. In our investigations we
have not found any authority in text books or adjudicated
cases which distinguishes between these and any other
official proceedings taken and returned in the discharge of
official duty as to their admissibility in evidence upon the
principle referred to. ·

The proper practice to be pursued by the officer in taking
and certifying testimony at an inquest is referred to by GUR-
NEY, B., in *R.* v. *Plummer*, 1 Carr and Kir. 604. It is the
practice contemplated by the statute of this State, which in
terms requires the Coroner *to take the testimony of the wit-
nesses in writing and return it to the District Court*, and this
practice seems to have been pursued by the Coroner in the
proceedings in question here.

That a witness may be contradicted by the production of
a deposition thus given by him before a Coroner, is as clear
upon principle as that he might be contradicted by the pro-
duction of his deposition in chancery. In *Rex* v. *Oldroyd*,
1 Russ and Ryan's Crown Cases, 87, the deposition of Eliz-
abeth Oldroyd, the mother of the prisoner, taken before the
Coroner, was received for the purpose of contradicting her
evidence given at the trial, and the question of its admissi-
bility for that purpose being reserved for consideration, it
was unanimously resolved by the twelve Judges (among
whom was Lord ELLENBOROUGH) that it was competent for
that purpose. So in *Commonwealth* v. *Hawkins*, 3 Gray, 463,
before Chief Justice SHAW and his associates, the prisoner,
on trial for the murder of one Leet, offered to impeach the
credit of the witnesses for the Commonwealth, by reading

in evidence certain depositions they had given before the Coroner at the inquest held upon the body of Leet, and a question thereupon arose, not indeed as to whether it was admissible to impeach the credit of a witness in that manner, for it was tacitly conceded by both the Attorney General and the Court that it was; the Court being of opinion, however, that the depositions in that case did not tend to show upon their face any contradiction between the evidence given before the Coroner and that given at the trial, excluded them, but in the course of his observations in that connection, the Chief Justice remarked that of the testimony given before the Coroner only those parts showing discrepancy or contradiction between the statements before the Coroner and the evidence given at the trial, could be read for the purpose of impeaching the credibility of the witness—"those parts," he said, "which went to show a discrepancy or contradiction by showing that the witness had given different accounts, at different times, by alleging a fact at one time which he denied at another, or by stating it in two ways inconsistent with each other." (See, also, *People* v. *Stephens*, 19 N. Y. 549.)

We are, therefore, constrained to hold that in excluding the deposition of Mary Murphy, as taken before the Coroner, there was error prejudicial to the legal rights of the prisoner, which entitles him to a new trial, and it is not necessary to notice the other points made.

In connection with the judgment which the rules of law compel us to render in this case, we think proper to repeat the language used here more than ten years ago in *People* v. *Williams*, 18 Cal. 193:

"In consideration of the number of appeals brought to this Court in criminal cases, upon technical points, having for the most part no necessary connection with the merits, we feel warranted in making some suggestions, an attention

to which we are persuaded will lead to a more speedy and satisfactory enforcement of criminal justice. In capital cases almost every case is appealed. We do not complain of this, even when the grounds of appeal do not present a plausible reason for the reversal of the judgment, since a natural sense of responsibility in the counsel to whose hands the life of a fellow-being is confided may well influence him to exhaust every legal resource to save his client from the last penalty of the law. But still it is important that the laws should be enforced, so as to render as certain as possible the conviction of those guilty of their infraction. With every disposition on the part of the Judges to do this, the effort frequently fails, because something is done or omitted which contravenes some arbitrary or technical right of the prisoner. Courts have no power in criminal cases to affirm a judgment, merely because the Judges are persuaded that upon the merits of the case the judgment is right. If any error intervenes in the proceeding, it is presumed to be injurious to the prisoner, and generally he is entitled to a reversal of the judgment, for it is his constitutional privilege to stand upon his strict legal rights, and to be tried according to law. And yet it very often happens that the matter of exception taken by him serves no other purpose than to defeat justice. For example, a question proper in itself is asked a witness, and the Court refuses to allow the answer; if answered the reply would possibly be worth little or nothing to the defense; yet for this error we would be bound to reverse a judgment which would have been the same whether the question were answered or not; for, though we might surmise, we would not *know* the effect of the denial of this legal right upon the jury, who are the sole judges of the facts. And many other illustrations might be given. As no man ought to be convicted unless on a full exposure of the merits of the case he is really guilty, it would seem that little or nothing is to be gained by interposing technical ob-

jections to keep a knowledge of the whole case on its legal merits from the jury, Questions as to the admissibility of evidence frequently arise, and in the hurry of a *nisi prius* trial the best Judge may err, especially when suddenly called to pass upon them without the aid of books or argument. These constitute the usual grounds of reversal. Whenever there is any doubt of the question, or rather, whenever the evidence proposed by the defense is not plainly inadmissible, it is better to let it go in, since, in nine cases out of ten, a single equivocal fact, of doubtful bearing upon the case, would have no effect upon the judgment of the jurors, who are usually disposed to pass and do pass upon the general merits. Not unfrequently the offer to make the proof and the exclusion of it have about the same effect on the minds of the jury—though it should not—as if the proof were introduced. If the course here suggested were pursued by the Prosecuting Attorneys, we are convinced that the number of convictions would not be less than at present, while the number of appeals, or at least the number of those successfully prosecuted, would be greatly diminished."

Judgment reversed and cause remanded for a new trial.