[Civ. No. 177.  Second Appellate District.—April 25, 1906.]

## Dr. A. MORGAN, Respondent, v. COUNTY OF SAN DIEGO, Appellant.

ACTION BY CORONER—COMPENSATION FOR INQUESTS—JURISDICTION—PRAYER OF COMPLAINT—ISSUES.—In an action by a coroner to recover compensation against the county for inquests held by him, where the complaint prayed for judgment in the sum of $588.25, with interest, and judgment was rendered therefor, upon issues joined by an answer, denying that anything was due, the superior court had jurisdiction of the cause, determined by the prayer of the complaint, and this court has jurisdiction of an appeal taken by the county, whatever concessions it may make in argument, or may have made upon the trial.

ID.—CONCESSIONS IN APPELLANT'S BRIEF—JURISDICTION NOT AFFECTED. Concessions made in the appellant's brief that a specified sum was due to the respondent, exceeding $300, does not, to the extent of such concession, render the judgment appealed from a consent judgment, nor affect the jurisdiction of this court.

ID.—EFFECT OF STIPULATION AT TRIAL—ISSUES NOT CHANGED.—Issues having been joined by the answer upon the whole amount claimed in the complaint, a stipulation at the trial that the only dispute was as to the necessity and jurisdiction of the coroner to hold fourteen inquests upon the bodies of persons named, and the plaintiff should have judgment by consent as to the matters not disputed, did not change the issues joined nor reduce the amount in issue, so as to affect the jurisdiction of the superior court or of this court.

ID.—AUTHORITY OF CORONER TO HOLD INQUESTS.—If the coroner has reasonable ground to suspect that the death or killing of a person was sudden and unusual, and of such a nature as to indicate the possibility of death by the hand of the deceased, or through the instrumentality of some other person, he has authority to hold an inquest. He has latitude in determining whether the case falls within section 1510 of the Penal Code. He may act upon information; and it should not be held that, merely because it has been determined that the deceased died a natural death, he had no right to hold an inquest.

ID.—INQUEST HELD BY JUSTICE OF THE PEACE—PRESUMPTION—UNAUTHORIZED INQUEST BY CORONER.—If a justice of the peace has held an inquest upon a body, it must be presumed, in the absence of evidence to the contrary, that he discharged his duty in the premises;

and where such inquest is not shown to have been unlawful, the
coroner cannot recover compensation for an inquest subsequently
held by him upon the same body.

APPEAL from a judgment of the Superior Court of San
Diego County, and from an order denying a new trial. E. S.
Torrance, Judge.

The facts are stated in the opinion of the court.

Cassius Carter, District Attorney, and W. R. Andrews,
Deputy District Attorney, for Appellant.

A. H. Sweet, and Stearns & Sweet, for Respondent.

GRAY, P. J.—This action is brought by the coroner of the
defendant county to recover compensation for his services in
some fourteen inquests, alleged to have been held by him.
The findings and judgment were in plaintiff's favor, except
as to one of said inquests; and the defendant appeals from
said judgment and from an order denying its motion for a
new trial.

It is objected by the respondent that the court has no ju-
risdiction of this appeal, because the amount in controversy
is less than $300. The amount of the judgment is $597.17.
The amount prayed for in the complaint is for the sum of
$588.25, together with interest thereon, etc. It is conceded
in appellant's brief that an amount is actually due plaintiff
on his first cause of action of $121.25, and on his second cause
of action of $127.50, and on his third cause of action of
$62.25, making in all $311; and respondent contends that
these concessions in the brief render the judgment, to the ex-
tent of said concessions, a consent judgment. This conten-
tion cannot be upheld. Nor do we think the concessions made
in the brief of appellant have the effect to oust this court of
jurisdiction of the appeal. If the superior court had juris-
diction of the case, this court has jurisdiction of the appeal.
The jurisdiction of the superior court is to be determined by
the prayer of the complaint; and it being for more than $300,
and there being no admission in the answer that any portion
of the amount claimed in the complaint is due, but, on the

contrary, a denial that anything is due, there can be no question but that the superior court had jurisdiction of the cause; and it follows that this court has jurisdiction of the appeal. Nor do the admissions of appellant made upon the trial of the case, as we understand them, reduce the amount in issue to less than $300.

It was stipulated at the trial of the case between the respective parties, ''that all the inquests referred to in the original complaint, and all those referred to in the supplemental complaint, were held in the manner and form required by law, provided the coroner had jurisdiction to hold the fourteen inquests upon the bodies of the following persons (naming the fourteen persons), and that the only dispute was the necessity and jurisdiction to hold these fourteen inquests, and that as to all matters excepting the jurisdiction to hold said fourteen inquests that the plaintiff have judgment by consent, and that all other questions were left out, and that plaintiff should have judgment by consent on the matters not disputed.''

As stated in plaintiff's testimony, and not contradicted, the facts surrounding the death of the deceased persons upon whom the several inquests were held, are as follows:

1. Sarah E. Dithelson: ''I received word that she had died under very peculiar circumstances, was not supposed to be sick, not sick enough to have a doctor, and was found in the morning hanging onto a dresser or chiffonier dead. Her husband left her in the night about 10 o'clock; she, not feeling quite as well as usual, had thought best to sleep near the stove, it being February. I was also informed that this woman had been very despondent. She was a second wife, and there had been a great deal of trouble with the children. They had lost some property, and the question was raised by the person informing me whether she had not committed suicide; so I held an inquest upon the body. . . . There was no physician in attendance, no death certificate given before the inquest, the case being referred to me immediately, and I relied upon the information that there was suspicions of suicide. A lady, whose name I have forgotten, told me before the inquest that she might have committed suicide. . . . I was informed there were suspicions of suicide, and I relied on the information.''

2. Maria Liara: ''She was an infant in a Mexican family. The child was born in the morning without the attendance of

any midwife or physician, not even the neighbors were called in. It lived until late in the afternoon and nothing was done to succor it at all, to sustain it, and the question was whether it was not a case of infanticide, allowed to die by neglect. The testimony showed on the inquest that the child was simply left in the room; nothing was done, it was a case of neglect, but whether it was intentional I do not know. I learned in advance of the inquest that nothing had been done for the treatment of the child, and the question was whether the child was allowed to die purposely.''

3. A. R. Wadsworth: ''He was a man in full vigor of health. I was called in that case as physician, and saw the remains but a few minutes after death. It occurred in the block above my house, and about noon time I arrived there, and another physician also arrived just after me. Wadsworth was a man in full vigor of health, who had just returned from down town with a brother in law—a man named Morgan, but no relative of mine—and the brother in law made the remark, calling him by his first name, and said: 'We just walked up town, and I do not know of anything that could have killed him unless he had been poisoned'; that is the expression he used. The brother in law said this to me, with whom he had just walked up from town. He died a few minutes after his return. He simply seated himself in a chair and expired. He was in the chair when I reached the place. There was nothing externally to lead to the cause of death.''

4. William LeGrande Cannon: ''He was a man thirty years of age, known to be a consumptive; been under the care of different physicians in this country and Europe, and was stopping at the Florence Hotel. He died on Sunday, and was taken with the hemorrhage in the morning. He was at that time under the care of a Christian Scientist, and Dr. Remondino was in the hotel at the time the hemorrhage took place. Some of the guests summoned Dr. Remondino. He learned that they did not require his services, as they believed in Christian Science, and after telling them that something ought to be done for the young man, the young lady treating him arrived and they went through their treatment, whatever it might have been, and, as I was told afterward, they gave him to understand there was nothing serious about the matter, he was just as well as ever, and he sat up and chatted,

and died about 10 o'clock Sunday night. His mother went to the undertaker to prepare the body and procure a certificate of death, and the health officer refused to grant one. And the president of the board of health had instructed that no death certificate should issue, unless it be signed by the Christian Scientist who had attended him, and she refused to sign such certificate and the body was held there. I was met at the depot by Dr. Remondino, and Dr. Hearne, and Dr. Remondino told me I must investigate this case, as it was a case of gross neglect.''

5. J. B. Getchel: ''That inquest was held February 7th. Mr. Getchel was an elderly gentleman, having a daughter living in National City. He had been visiting her some little time. He had no acquaintances except his daughter and those he happened to have met over in National. He had not been sick at all; had left the house early in the morning after breakfast, and was out for a little walk, and going into a barber-shop, did not say a word, except he nodded his head as he came in, and sat down in the barber chair and put his head back, and the barber went to put the apron over him and he gasped, and was dead. No one had been with him after he had left the house and before he went to the barber-shop. He had been walking all alone. Some three hours had elapsed since leaving the house. I was informed he had been out alone some three hours, and then went to the shop. . . . Dr. Fly was called in, but he was dead when he arrived. I asked Dr. Fly if he knew any cause for the death, and he said no. He was not acquainted with him, never had seen him, knew nothing about him.''

6. Santiago Lopez: ''This man was shot and killed at Picacho.'' It appears that a justice of the peace at Picacho held an inquest on the body of Lopez prior to the one held by the plaintiff in this case.

7. Joseph H. Cowan: ''Cowan was a man about seventy-five years old. He arrived with his wife to this city in the evening. He was an invalid, came here for his health and had some trouble, as I understood, with the heart. They secured rooms at the corner of 3d and C that evening, and he was taken sick during the evening and died before morning. No one was called in to see the case and they told no one about it. The circumstances seemed to me to point to something a little wrong. It seemed as though a man who would travel

as far as from Montana for his health, and then, when taken sick, no one was called in, there might be something suspicious about it, and so I held an inquest. That was all the information I had to hold the inquest."

8. M. J. Russell: "I had a telegram from Constable Trotter, at Oceanside, calling me there. It stated: 'Come to Oceanside; Mrs. Russell found dead in bed; Trotter'; and I went and held an inquest. She died all alone in a house where she had been living, about two and one-half miles out of the city. No neighbors were within a quarter or half mile. I saw Dr. Nichols when I got to Oceanside, and he told me that she had died in some sort of convulsions, as her position after death showed it. . . . The convulsions would lead one to believe she had possibly taken some poison, or had been poisoned."

9. Arthur Dye: "I received a telephone from Mr. Dye, who lives at Witch Creek, to come out there and hold an inquest on his boy, who had been drowned, and I got nothing more of the circumstances. A telephone message came to Johnson & Connell to send the coroner to Witch Creek to hold an inquest on the body of Arthur Dye, who had been drowned, and I went out and held the inquest on the body of the boy. Before holding the inquest, I was informed that the boy had gone in swimming in a little pool in Witch Creek, with another brother and sister, and that the boy died and was drowned."

10. Juan Delgado: "I was called down to the government corral one night, and found there a person dead. The soldier who was on sentry duty said he had passed him as he was walking up the sidewalk, and he noticed he staggered a little bit, and he turned around to look at him. He went a ways beyond him and fell down. He went up to him and found he was dead, and called. He went back in the guard-house and called an assistant, and they took the body and brought it into the guard-house, and got the county physician, although the man was dead. The county physician found the man dead, and he called me up and I went down there. It was 6 o'clock, on the edge of dark, in September. Nobody had seen the man or knew anything about his whereabouts, excepting what the soldier said. It was very hard to find out who the man was, or learn where he came from. Nothing to indicate where he had come from, or what he had been doing."

11. John Augustus Dowd: "He was found dead in a closet, back of a saloon. I thought that was circumstance enough to investigate, and held an inquest upon it to see what caused the death. No one saw the man go there. The man who occupied the saloon heard someone come in the saloon. I have no information except that he was found dead. . . . I knew him myself. He had gone in the closet some twenty minutes before the body was discovered. His condition as to sobriety was that he was able to walk around and about, though that morning he had fallen down and hurt himself. The man was a drinker right along. He was drinking all the time, and there had been months that he was never sober. That morning he was sober, however."

12. C. T. Sheppard: "This was an infant two months old. I got my information from Dr. Parker, who was called into the case and had attended the child at its birth, and had not been called in since. Dr. Parker stated that he was called in the morning to see the little one, and found her dead. Upon examining it, he said the symptoms were that the child died from suffocation. He did not feel like giving a death certificate, and referred the case to me, as coroner, and said it was a case for me to hold an inquest. Upon that information I held the inquest. I spoke to the father about the matter, who said that they put the child to bed; about 9 o'clock it cried and he had tucked it away; and then again later it woke up and cried, and he tucked it up in its little baby carriage it slept in, and when he got up in the morning the child was dead. The child had been suffocated by the clothing. The father explained to me he put the child to bed, but said of course he hadn't done it with any intent. The child was very troublesome. The child being suffocated to death, it was a case I always thought coroners had to investigate, when anything of that kind occurred."

13. C. C. Boyle: "This man was seventy-seven years old, and was found drowned in the tank at Coronado. I thought it was a suspicious case by his being drowned in a tank like that, where there were so many people in the tank; the swimming teacher was in the tank at the time, and I held an inquest upon the body. The only information I had before holding the inquest was, that he went in swimming in the tank and was drowned. They brought him out of the water

and put him on the side of the tank, and found him dead. They worked over him; there was a physician among the spectators, who said to me he thought the man had some other trouble. The autopsy showed that he was drowned. There seemed to be no one implicated in it. It was a case of accidental drowning.''

It is provided by section 1510 of the Penal Code that, ''when a coroner is informed that a person has been killed, or has committed suicide, or has suddenly died under such circumstances as to afford a reasonable ground to suspect that his death has been occasioned by the act of another by criminal means,'' he must hold an inquest. Upon the interpretation of the language of this section depend the questions submitted upon this appeal as to whether the coroner had jurisdiction to hold an inquest in the several cases referred to, and also as to whether it was necessary to hold inquests in the several cases. Of course, it is plain that the first thing the coroner is called upon to do, when a death is called to his attention, is to determine whether or not it is a case coming within the section quoted. In deciding this question some latitude should, of course, be allowed the coroner. It should not be held that, simply because at the conclusion of an inquest it has been determined that the deceased died a natural death, he had no right therefore to hold an inquest. Under the terms of the section referred to, he has a right to act upon information. When he is informed that a person has been killed, or has committed suicide, he is warranted in holding an inquest. In this connection, what does the word ''killed'' mean? Certainly, if a man falls off a house and is killed by striking the pavement, it is not improper to speak of him as having been killed by the fall. If he is drowned, in speaking of his death it is perfectly proper to say that he was killed by drowning. If an infant dies of neglect, the neglect is what kills the infant. We might even say that consumption killed one of the deceased persons mentioned herein. In its broadest sense, a person may be killed by anything that causes his death. We do not think, however, that the term ''killed'' as used in the statute embraces every means of death, but that it is qualified by the other clauses used in the statute, and that the whole section should be construed together. We think the killing should be shown to have been sudden and

unusual, and of such a nature as to indicate a possibility of death by the hand of the deceased, or through the instrumentality of some other person. Construed in this way and measured by this rule, we find it difficult to select any one of the foregoing thirteen cases and say of it that it appears to us beyond controversy that there was no ground "to suspect" that the death, or the killing, was sudden and unusual, and the taking off of the party occasioned either by the act of another by criminal means, or by the intentional act of the deceased himself. We think, therefore, that, for the purpose of determining whether the coroner shall have his fees for the services performed, we would not be warranted in deciding in any of the thirteen cases that there was no reasonable ground for holding an inquest, or that the coroner went beyond his jurisdiction in so doing.

As to the case of Santiago Lopez, it appears that an inquest had already been held upon the body of Lopez by a justice of the peace, and, in the absence of anything to show otherwise, we will presume that that officer proceeded according to his duty in the premises. To be sure, he is a judicial officer of an inferior court, and ordinarily no presumptions are to be indulged in favor of the jurisdiction of the court over which he usually presides; but in this case he was acting in his special capacity to hold inquests, and this is not a direct proceeding to review his action, but is in the nature of a collateral attack upon his action, and under a section of our code, official duty is presumed to have been regularly performed. We hold that one inquest, duly and lawfully held in accordance with the law upon one body, is sufficient, and he who undertakes to hold a second inquest has the burden to show that the first inquest, for some reason, was not lawful; and unless he does that, he should not be permitted to receive any fees for his services. We wish also to say that the circumstances detailed in the evidence were of such a nature that the justice of the peace had a right—indeed, it was his duty—to exercise his jurisdiction in the matter of holding this inquest.

The order denying a new trial is, therefore, affirmed, and the court below is directed to modify its judgment by reducing it in the amount of the fees claimed in the matter of Santiago Lopez.

Allen, J., and Smith, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 21, 1906.