[Civ. No. 6955. First Appellate District, Division Two.—August 1, 1929.]

EMMA L. HUNTLY, Appellant, v. ZURICH GENERAL ACCIDENT AND LIABILITY INSURANCE COMPANY et al., Respondents.

Raymond Perry for Appellant.

Ford, Johnson & Bourquin, John J. O'Toole, City Attorney, Henry Heidelberg, Assistant City Attorney, and J. Hampton Hoge for Respondents.

LAMBERSON, J., *pro tem.*—Plaintiff appeals from orders of the Superior Court granting defendants' motions for nonsuit and from the resulting judgment entered in favor of defendants.

The action is one to recover damages from the defendants arising from their alleged acts in jointly causing an autopsy to be performed upon the body of Thomas H. Huntly, deceased, husband of plaintiff herein.

Mr. Huntly died in the county of Los Angeles on March 22, 1926. A partial autopsy was performed upon the body by a surgeon occupying the position of autopsy surgeon in the office of the coroner of Los Angeles County, under the authority of the coroner, but no inquest was held in that county. The body was shortly thereafter shipped to San Francisco, which was the home of the deceased and his wife. Upon its arrival in San Francisco the body was received by representatives of the defendants Suhr and H. F. Suhr Company, and taken to their undertaking establishment.

It appears that the autopsy surgeon at Los Angeles determined that the cause of death was angina pectoris, and the coroner issued a death certificate upon such finding. Apparently dissatisfied with the result of the examination in Los Angeles, the plaintiff asked the defendant Suhr to give her the name of some surgeon who could make a further examination of the body and determine for her benefit the nature of a bruise appearing upon the forehead of the deceased. Mr. Suhr referred plaintiff to defendant Strange, who was then occupying the position of autopsy surgeon under the defendant Leland, who was coroner of the city and county of San Francisco. In an interview with Dr. Strange plaintiff asked him some questions about the possible effect of a blow on the forehead of the deceased. Dr. Strange asked if there had been an autopsy and if the people who performed such autopsy had examined the head.

According to the testimony of Dr. Strange, who was called as a witness on behalf of plaintiff, plaintiff asked him to do a

private autopsy upon the body of her husband. He asked her what kind of a death it was, and upon being informed that the deceased died while at work and as the result of an accident, Dr. Strange informed her that he did not believe he would have a right to perform a private autopsy on a violent death case, and that plaintiff informed him that she wanted to have the skull opened to find out if there was a fracture, because she thought she was entitled to certain insurance as the result of a death by accident; that she was not satisfied that the cause of death was angina pectoris, and wanted Dr. Strange to open the head to find out if there was a fracture of the skull, and Dr. Strange informed her that the matter should be taken up through the coroner's office.

The matter was reported to the coroner, who was informed, according to the testimony, that a partial autopsy had been performed at Los Angeles. He ordered that an inquest be held, and that an autopsy be performed, and the body was later removed to the office of the coroner, where the autopsy was performed by Dr. Strange, who testified that there had been a prior incision, and that he opened the body by cutting the stitches; that the organs had all previously been cut loose and examined. He found the arteries hardened, and took small samples from the heart, as well as from other organs of the body. He also opened the head and examined the skull to see if there had been a fracture, and examined the brain to ascertain whether there had been a contusion or laceration of the brain. The organs, with the exception of the specimens, were returned to the body. The specimens, which included samples from the brain, heart, lungs, spleen, kidneys and liver, were placed in a six-ounce bottle, containing a fluid, and were delivered to the defendant Ophuls for microscopic and other examination. Ophuls, who was in the employ of the defendant insurance company, was not present at the autopsy and did not see the body of Mr. Huntly, but received the samples from attendants at the coroner's office.

In her opening brief appellant states that the defendants are sued as joint tort-feasors, the defendant insurance company for having employed the defendant Newlin to employ defendant Ophuls to remove the specimens; the defendant Newlin, who was present at the autopsy, for unlawfully witnessing the mutilation and employing Dr. Ophuls to remove the speci-

mens; defendant Ophuls for an unlawful examination and removal of specimens; defendant H. F. Suhr Company and Fred Suhr for the unlawful removal of the body from their parlors for the purpose of mutilating it; defendant Leland for unlawfully granting permission to perform the mutilation, for permitting the use of his office for an unlawful mutilation and for permitting the unlawful removal of specimens, and the defendant Strange for performing the mutilation. Plaintiff claims that the autopsy was performed without her consent or knowledge, and that she was not informed of the same until the defendant Newlin informed her of it at his office at some later date.

The plaintiff alleges, in substance, that on the twenty-second day of March, 1926, the coroner of the county of Los Angeles ordered his assistant autopsy surgeon to perform an autopsy upon the body of Thomas H. Huntly, and said surgeon did on that date perform a legal autopsy upon said body; that the defendants, and each of them, knew on the twenty-fourth day of March, 1926, that "the legal and only lawful autopsy" had been performed by and under the authority of the coroner of the county of Los Angeles.

The complaint then alleges as follows:

"X.

"That on the 24th day of March, 1926, said defendants, with knowledge that a lawful autopsy had been performed upon the body of Thomas H. Huntly, did cause said body of the late Thomas H. Huntly to be removed from the undertaking establishment of H. F. Suhr Company in the City and County of San Francisco, State of California, to the office of the coroner of the City and County of San Francisco, State of California, without the consent, knowledge, or authority of the plaintiff, and did mutilate, desecrate, violate and outrage, and commit an act of irreverence and profanation upon the body of the late Thomas H. Huntly, in that without the permission of the plaintiff, the widow of the said Thomas H. Huntly, and the lawful owner and possessor of said body, and without authority of law, did perform in the City and County of San Francisco, State of California, a mutilation, desecration and violation upon said body of said Thomas H. Huntly in this: that said defendants did cause the skull of said Thomas H. Huntly to be opened and the brains removed; the body of said Thomas H.

Huntly to be opened and specimens of the heart, lungs, kidneys, liver and spleen to be removed and said specimens of the heart, lungs, kidneys, liver, spleen and brains to be delivered to the defendant William Ophuls, as the agent and representative of the defendant Zurich General Accident and Liability Insurance Company, a corporation.

"XI.

"That said mutilation, desecration, violation and outraging of the head and the body of her deceased husband was repugnant to the plaintiff, was offensive to and indecently insulted the said plaintiff, and by reason of said acts, and each of them, did cause the plaintiff a shock to her mental and physical equipoise, causing violent agitation of feeling and disturbances of her mind and wrecking her mental and physical equipoise, to her horror, mental anguish and extreme disgust, and disturbing permanently her peace of mind.

"XII.

"That by reason of the said acts of the defendants aforesaid the plaintiff has been damaged in the sum of $75,000.00."

The complaint was filed on May 6, 1927.

Upon the trial, and at the close of plaintiff's case, motion for nonsuit was made upon behalf of each of the defendants upon the ground, among others, that the action was barred by the provisions of subdivision 3 of section 340 of the Code of Civil Procedure, and the motion was granted as to each of the defendants upon that ground.

Plaintiff contends that the cause of action stated in the complaint falls within the provisions of subdivision 1 of section 339 of the Code of Civil Procedure, which reads in part as follows: "Within two years: An action upon a contract, obligation or liability not founded upon an instrument of writing, other than that mentioned in subdivision 2 of section 337 of this code . . . "

Defendants contend, on the other hand, that the action is one to recover damages for an injury to the person of the plaintiff, caused by the wrongful act of the defendants in mutilating, as alleged, the body of the deceased, · and is barred by the provisions of subdivision 3 of section 340 of the Code of Civil Procedure, which reads in part as follows: "Within one year . . . 3. An action for libel, slander, assault, battery, false imprisonment, seduction or for injury

to or for the death of one caused by the wrongful act or neglect of another."

The subdivision just quoted has undergone several amendments since its original enactment.

As enacted in 1872, it read "an action for libel, slander, assault, battery or false imprisonment." In 1874, the words "or seduction" were added, and in 1905, there were added the words "or for injury to or for the death of one caused by the wrongful act or neglect of another."

The primary question for consideration is the nature of the right upon which the plaintiff bases her cause of action.

■ In the absence of statutory provision, there is no property in a dead body. (*Enos* v. *Snyder*, 131 Cal. 68 [82 Am. St. Rep. 330, 53 L. R. A. 221, 63 Pac. 170].)

Various statutes have been enacted for the purpose of enforcing, as well as protecting the duties which we owe to the bodies of the dead, as well as the public welfare and health. Among them is section 294 of the Penal Code, which provided at the time of the incident under examination as follows: "The person charged by law with the duty of burying the body of a deceased person is entitled to the custody of such body for the purpose of burying it; except that in the case in which an inquest is required by law to be held upon a dead body by a coroner, such coroner is entitled to its custody until such inquest has been completed."

The reservations and safeguards which have been placed around the right of possession by the relatives to the body of a deceased person have caused confusion in some cases, with the right of ownership, and have led to the use of the expression *"quasi* property." Numerous authorities, however, from earliest times to the present, support the conclusion of the courts of this state that there can be no ownership in a human body after death. An interesting discussion of the law, civil, common and ecclesiastical, is found in the case of *Pierce* v. *Proprietors Swan Point Cemetery*, 10 R. I. 227, 242 [14 Am. Rep. 667]. Therein the court said: "Although as we have said, the body is not property in the usually recognized sense of the word, yet we may consider it as a sort of *quasi* property to which certain persons may have rights, as they have duties to perform toward it, arising out of our common humanity. But the person having charge of it cannot be considered as

the owner of it in any sense whatever; he holds it only as a sacred trust for the benefit of all who may from family or friendship, have an interest in it, and we think that a court of equity may well regulate it as such, and change the custody if improperly managed.''

In the case of *Darcy* v. *Presbyterian Hospital*, 202 N. Y. 259 [Ann. Cas. 1912D, 1238, 95 N. E. 695], the Court of Appeals of New York said: ''The most elaborate consideration of the question in the courts of this country appears in the case of *Larson* v. *Chase*, 47 Minn. 307 [28 Am. St. Rep. 370, 14 L. R. A. 85, 50 N. W. 238], in which, after an examination of authorities, both in this country and in England, the conclusion is reached that while no action can be maintained by the executor or administrator upon the theory of any property right in a decedent's body, the right to the possession of a dead body for the purpose of preservation and burial belongs to the surviving husband or wife or next of kin, in the absence of any testamentary disposition; and this right the law will recognize and protect from any unlawful mutilation of remains by awarding damages for injury to the feelings and mental suffering resulting from the wrongful acts, although no pecuniary damage is alleged or proved. . . . ''

In the case of *Beaulieu* v. *Great Northern Ry. Co.*, 103 Minn. 47, 52 [14 Ann. Cas. 462, 19 L. R. A. (N. S.) 564, 114 N. W. 353], the court said: ''The rule laid down in the Larson case expresses the modern view of the question, and extends a remedy where otherwise none would exist. There being no property in dead bodies, and the wrong complained of being only the invasion of an intangible legal right, no actual damages for the wrongful mutilation of the body can be recovered, and the courts award *solatium* for the bereavement of the next of kin as the only appropriate relief. Without the element of mental distress, the action would be impotent of results and of no significance or value as a remedy for the tortious violation of the legal right of possession and preservation.''

In the case of *Hasselbach* v. *Mt. Sinai Hospital*, 173 App. Div. 89 [159 N. Y. Supp. 376], the court held that it is well settled that there are no property rights in the ordinary commercial sense in a dead body, and the damages allowed to be recovered for its mutilation are never awarded as a

recompense for the injury done to the body as a piece of property.

 Having come to the conclusion that there is no ownership in the body of a deceased human being, the next question for determination is the nature of the wrong for which damages are being sought in this action.

It is plaintiff's contention that her right to maintain an action arose out of the mutilation of the body, and that "the measure of damages is the mental suffering. Therefore, the damages for mental suffering are not the gist of the cause of action."

The injury upon which plaintiff bases her cause of action was an injury to her person.

In the case of *Sloane* v. *Southern Cal. Ry. Co.*, 111 Cal. 668 [32 L. R. A. 193, 44 Pac. 320, 322], the court said: "The real question presented by the objections and exceptions of the appellant is, whether the subsequent nervous disturbance of the plaintiff was a suffering of the body or of the mind. The interdependence of the mind and body is in many respects so close that it is impossible to distinguish their respective influence upon each other. It must be conceded that a nervous shock or paroxysm, or a disturbance of the nervous system, is distinct· from mental anguish, and falls within the physiological, rather than the psychological, branch of the human organism. It is a matter of general knowledge that an attack of sudden fright or an exposure to imminent peril has produced in individuals a complete change in their nervous system, and rendered one who was physically strong and vigorous weak and timid. Such a result must be regarded as an injury to the body rather than to the mind, even though the mind be at the same time injuriously affected. Whatever may be the influence by which the nervous system is affected, its action under that influence is entirely distinct from the mental process which is set in motion by the brain. The nerves and nerve centers of the body are a part of the physical system, and are not only susceptible of lesion from external causes, but are also liable to be weakened and destroyed from causes primarily acting upon the mind. If these nerves or the entire nervous system is thus affected, there is a physical injury thereby produced, and, if the primal cause of this injury is tortious, it is immaterial whether it is

direct, as by a blow, or indirect through some action upon the mind.''

The language of that opinion was expressly approved in *Lindley* v. *Knowlton*, 179 Cal. 298 [176 Pac. 440].

In the case of *Johnson* v. *Sampson*, 167 Minn. 203 [46 A. L. R. 772, 208 N. W. 814], the court had under consideration an action in which false charges of unchastity had been made against a school girl fifteen years of age, resulting in alleged mental and bodily injuries. In its discussion of the case, the court said: ''On the whole we see no good reason why a wrongful invasion of a legal right, causing an injury to the body or mind which reputable physicians recognize and can trace with reasonable certainty to the act as its true cause, should not give rise to a right of action against the wrongdoer, although there was no visible hurt at the time of the act complained of.''

In the case of *Morton* v. *Western Union Tel. Co.*, 130 N. C. 299 [41 S. E. 484, 485], the court, in discussing the meaning of the phrase ''or other injury to the person,'' said: ''In law, the word 'person' does not simply mean the physical body, for, if it did, it would apply equally to a corpse. It means a living person, composed of body and soul. Therefore any mental injury is necessarily an injury to the person. Personal injuries may be either bodily or mental, but, whether one or the other, they infringe upon the rights of the person, and not of property. A learned author has said that: 'The mind is no less a part of the person than the body, and the sufferings of the former are sometimes more acute and lasting than those of the latter. Indeed, the sufferings of each frequently, if not usually, act reciprocally upon the other.' ''

The allegations of injury to the plaintiff, as set forth in the complaint, have already been stated. The gravamen of the cause of action, as alleged, was the shock to the plaintiff, mental and physical. Without such injury to her, personally, there could have been no cause of action for the reasons heretofore discussed. In support of her case, the plaintiff introduced testimony as to her physical and mental condition as indicated by insomnia, hysteria and nervousness.

Her physician testified that she was suffering from ''exhaustion psychosis,'' which he defined as a lowered condi-

tion of her nervous and physical system, a low blood pressure, a lowered mental condition, a slow power of concentration, a tardy memory, general weakness of her nervous system and as an anemia due to an interference of the nervous system that controls the blood mechanism and blood nutrition.

We think that the inescapable conclusion from the allegations of the complaint, and from the testimony offered on behalf of plaintiff, must be that the injury that was inflicted was to the person of the plaintiff, as a result of the acts of the defendants.

■ It is not necessary that an act of force and violence, or a battery, be inflicted upon the plaintiff in order to bring the case within the meaning of subdivision 3 of section 340 of the Code of Civil Procedure.

In the case of *Basler* v. *Sacramento etc. Ry. Co.*, 166 Cal. 33 [134 Pac. 993] the plaintiff's wife sustained a personal injury by reason of the negligence of the defendant, and the plaintiff sued for the loss of his wife's services and for the expense incurred in her medical care.

■ The court held that the action was barred under the provisions of subdivision 3 of section 340 because it was one for personal injuries and not upon an obligation or liability not founded upon an instrument in writing. In the discussion of the case at page 36 the court said:

"It has been held that the word 'for' means 'by reason of,' 'because of' and 'on account of' and that a statute prescribing a limitation on 'actions for injury to the person . . . caused by negligence' should be interpreted to mean 'actions "by reason of" or "because of," or "on account of" injuries to the person caused by negligence.' (*Sharkey* v. *Skilton*, 83 Conn. 503 [77 Atl. 952].) Applying this rule to our own statute we must hold that the language of section 340 quoted above refers to actions for damages 'on account of' personal injuries. In *Sharkey* v. *Skilton*, the plaintiff was the husband of the injured woman and there, as here, counsel sought to make a distinction between the direct injury to the wife and the indirect damages and loss to the husband, but the court held that both harmful results had their efficient cause in the accident to her and that therefore the same statute of limitations applied to actions in which the wife was a party

and to those in which the husband sued alone because of his relative rights.

"*Maxson* v. *Delaware, Lackawanna & Western R. R. Co.*, 112 N. Y. 560 [20 N. E. 544], was a case similar to this in which the husband sued for the loss of his wife's services because of injuries received by her on account of the defendant's negligence. It was held that his cause of action was governed by the statute prescribing the time within which an action might be commenced for a 'personal injury, resulting from negligence.'

"We see no escape from the reasoning of the foregoing authorities."

It is unnecessary to cite numerous cases in other jurisdictions which are in accord with the conclusion of our courts that there need be no physical contact with the body of a person to constitute a cause of action for personal injury. When a bodily injury occurs, the law considers the action as one for personal injuries, regardless of the nature of the breach of duty. It adopts the nature of the damage as the test, and not the nature of the breach.

In the case of *Groff* v. *DuBois*, 57 Cal. App. 343 [207 Pac. 57], which was an action for damages for an injury alleged to have been suffered by plaintiffs as the result of an unlawful and malicious attempt by the defendants to eject them from certain premises of which they were in lawful and peaceful possession, and which it was alleged resulted in one of the plaintiffs suffering a miscarriage, the court held that the action was one brought for injury to the person, and should have been commenced within one year. In accord are *Krebenios* v. *Lindauer*, 175 Cal. 431 [166 Pac. 17]; *Harding* v. *Liberty Hospital Corp.*, 177 Cal. 520 [171 Pac. 98].

We are of the opinion that by the amendment to subdivision 3 of section 340 introducing the clause "or for injury to or the death of one caused by the wrongful act or neglect of another," it was intended to embrace therein all infringements of personal rights as distinguished from property rights.

In this case plaintiff's cause of action arose solely from her relationship to deceased, and the effect the mutilation of his body had upon her, personally. If there had been an estrangement between herself and her husband, or an

absence of affection, or such an attitude of mind that the alleged desecration occasioned no anguish or distress or injury, then the plaintiff would have had no cause of action. As pointed out by respondents, the right which she sought to exercise in caring for her husband's body in death was one strictly personal to her, and which could not have been exercised by others.

The objection has also been made that the trial court erred in granting a motion for nonsuit against the defendant Leland, which was made upon the additional ground that the evidence introduced failed to show any carelessness or negligence upon the part of that defendant, or any breach of duty upon his part owing to the plaintiff.

█ Section 1510 of the Penal Code provides that when a coroner is informed that a person has been killed, or has committed suicide, or has suddenly died under such circumstances as to afford a reasonable ground to suspect that his death has been occasioned by the act of another by criminal means, he must go to the place where the body is and summon not less than nine nor more than fifteen persons, qualified by law to serve as jurors, to appear before him forthwith, at the place where the body of deceased is, to inquire into the cause of death.

Section 1512 provides that the coroner may summon a surgeon or physician to inspect the body, or hold a postmortem examination thereon, or a chemist to make an analysis of the stomach, or the tissues of the deceased, and give a professional opinion as to the cause of death.

If the coroner has reasonable ground to suspect that the death or killing of a person was sudden or unusual and of such a nature as to indicate the possibility of death by the hand of the deceased, or through the instrumentality of some other person, he has authority to hold an inquest. He has latitude in determining whether the case falls within section 1510 of the Penal Code. He may act upon information, and it should not be held that simply because at the conclusion of an inquest it has been determined that the deceased died a natural death, he had no right, therefore, to hold an inquest. (*Morgan* v. *County of San Diego,* 3 Cal. App. 454 [86 Pac. 720].)

█ A coroner may order an autopsy when, in his judgment, that is the appropriate means of ascertaining the

cause of death, and this he may do without the consent of the family of the deceased. (*Young* v. *College of Physicians & Surgeons,* 81 Md. 358 [31 L. R. A. 540, 32 Atl. 177].)

In the case of *People* v. *Devine,* 44 Cal. 452, at page 458, the court said: "At common law, as well as under the statute of Edward I, and our statute concerning coroners, which are but declaratory of the common law, the coroner holding an inquest *super visum corporis* is in the performance of functions judicial in their character (*R.* v. *White,* 3 E. & E. R. 144; Rep. Const. Ct. So. Ca. 231; 32 Mis. R. 375); so distinctly judicial that he is protected under the principles which protect judicial officers from responsibility in a civil action brought by a private person. (*Garnett* v. *Ferrand,* 6 Barn. & Cress. 611.)"

It is presumed, in the absence of a contrary showing, that an official duty has been regularly performed. (*Morgan* v. *County of San Diego, supra;* Code Civ. Proc., sec. 1963.)

The evidence offered by plaintiff shows that no inquest was held in Los Angeles County. The performance of an autopsy was not the holding of an inquest. It also shows that upon the arrival of the body in San Francisco plaintiff was dissatisfied with the findings of the autopsy surgeon in Los Angeles; that she represented that her husband's death was sudden; that he had had a "terrible fall." She further expressed the idea that his death had been occasioned by violence of some sort and was not the result of natural causes. Under the circumstances, the body being within the city and county of San Francisco, and within the jurisdiction of the defendant Leland, and he having been informed that no inquest had been held in the county of Los Angeles, and there being a question as to the cause of death as expressed by the plaintiff, the coroner acted within his authority in ordering an inquest held, and in authorizing his autopsy surgeon to proceed in the usual manner.

The decision of the question as to whether an inquest is necessary rests in the sound discretion of the coroner, and there is nothing in the record to counteract the presumption that he regularly performed his duty as coroner, and there was no breach of any duty which he owed to the plaintiff.

It is our opinion that the motions for nonsuit, based upon

the ground that the cause of action was barred within one year, were properly granted; and that the motion for nonsuit as to the defendant Leland, based upon the ground that the evidence introduced in the case failed to show any carelessness or negligence on the part of the defendant Leland, or any breach of duty on the part of such defendant owing to plaintiff, was also properly granted. We deem it unnecessary to discuss the other objections made by plaintiff to the judgment entered herein.

The judgment is affirmed.

Sturtevant, J., and Nourse, Acting P. J., concurred.