## WALTER FAUCETT v. STATE.

No. A-1207.   Opinion Filed September 9, 1913.

(134 Pac. 839.)

1.  **WITNESSES—Immunity—Question for Court.**  The question of immunity is one for the court alone, and should never be submitted to a jury.

2.  **SAME—Immunity—Powers of Justice.**  A justice of the peace, acting as coroner at an inquest for murder, is without power to compel a witness to answer questions which might incriminate such witness, and is without power to grant immunity to any witness for answering self-incriminating questions.

3.  **CORONERS—Inquest.**  A justice of the peace is without jurisdiction to hold an inquest except over the bodies of persons the causes of whose death are unknown, and who are supposed to have died from unlawful means.

*Appeal from District Court, Tulsa County;*
*L. M. Poe, Judge.*

Walter Faucett was convicted of manslaughter, and appeals. Affirmed.

After a jury was impaneled and sworn to try the case, counsel for appellant filed the following special plea:

"The defendant, Walter Faucett, further pleads that, after the deceased, John Cox, was stabbed, and after this defendant had been arrested on a warrant issued by John J. Slack, justice of the peace of Tulsa township in Tulsa county, Okla., charged with the offense of cutting and stabbing the said John Cox, with intent to kill the said John Cox, and while said prosecution

was pending against said defendant, he was compelled to testify under legal process concerning said killing over his objection, and, after he had claimed the protection of section 21 of article 2 of the Constitution of the state of Oklahoma, that he was so compelled to testify at the coroner's inquest, held before John J. Slack, justice of the peace of Tulsa township, Tulsa county, Okla., in the city of Tulsa, Okla., for the purpose of legally and judicially determining how the said John Cox came to his death, and by what means, and for the purpose of prosecuting criminally the parties so found to have caused his death, and that the defendant was compelled to appear before said justice of the peace at said inquest in obedience to a subpoena issued by said John J. Slack, justice of the peace and *ex officio* coroner of Tulsa county, Okla., commanding him to appear at said hearing to testify concerning the death of said John Cox, which subpoena was duly and legally served upon this defendant by a legally appointed, qualified, and acting deputy sheriff of Tulsa county, Okla.; that, in response to said subpoena, this defendant appeared before the said justice of the peace and *ex officio* coroner at said inquest, and was compelled by said justice of the peace and *ex officio* coroner to testify before the coroner's jury, there duly legally impaneled and constituted, concerning the killing and the death of said John Cox, after he had objected to so testifying, and had claimed the protection of the said constitutional provision, and that, under the compulsion aforesaid, the defendant then and there detailed to said jury all the facts and circumstances surrounding the cutting and death of the said John Cox, so far as known to this defendant; and that, by reason of the foregoing facts and circumstances, this defendant became immune from this prosecution by virtue of section 27 of article 2 of the Constitution of Oklahoma, and the state of Oklahoma has thereby lost its right and power to prosecute this defendant upon this charge, or under this information.   Walter Faucett."

The court inquired of counsel for appellant if he desired to offer any evidence in support of the special plea.   Counsel for appellant stated that he thought it would be proper to establish the allegations on the trial, and submit the matter in the instructions to the jury.   The following evidence was then introduced:

G. H. Butler testified for the state that he was a physician, and attended John Cox when he received the injury from which he died; that Cox had received a knife wound in his left side

between the tenth and eleventh ribs; that the wound was one and one-half to two inches in length, and ranged downward to the right; that deceased lost a great deal of blood and a part of the contents of his bowels, consisting of undigested food, which came through the wound; that the wound extended almost entirely through his abdominal cavity, and passed almost through the said Cox, ranging downward and backward; that deceased died from the effects of the wound.

J. Harlow testified for the state that he knew John Cox, the deceased, and was also acquainted with appellant; that appellant was interested in a barbecue stand in the city of Tulsa; that on the day of the difficulty witness went with John Cox to this barbecue stand; that a fight occurred in the barbecue stand between John Cox and appellant; that witness does not know how the fight began; the first thing he knew they were fighting, and that appellant got deceased down on the floor, when appellant was pulled off of the deceased by the crowd present, and deceased was put out of the house; that after the deceased was put out of the house witness saw appellant coming out with a knife; that appellant went outside of the house, and this was all that witness saw; that witness did not see any of the fight outside of the house.

J. W. Cox testified that he was acquainted with the deceased; that on the day of the difficulty with J. Harlow he entered the barbecue restaurant kept by appellant for the purpose of taking a drink with said Harlow; that the deceased attempted to come into the restaurant also and stepped in the door; that witness said to deceased, "John, get out of the door, this man (referring to appellant) wants to get out." Deceased says, "If he wants out any faster than I am getting out, let him put me out"; that when deceased said this appellant struck deceased a lick in the butt of the ear, and then deceased and appellant began to fight; that witness left the place, and did not see any of the trouble, because he did not want to be a witness in police court.

J. C. Selser testified for the state that he saw appellant stab the deceased; that witness first noticed the deceased on the sidewalk by the barbecue restaurant of appellant, bareheaded, and

that some one inside of the house handed deceased his hat from the door; that deceased took his hat and started to walk on across the sidewalk; that appellant came out of the house with a knife in his hand; that deceased started in a kind of a run; that appellant overtook the deceased about half way across the street and stabbed him with a knife; that deceased was not doing anything except trying to get away when appellant overtook him and stabbed him with a butcher knife; that witness was about 90 feet away from the place of the stabbing.

W. T. Downs testified for the state that he saw appellant stab the deceased; that deceased came out of the building occupied by appellant as a barbecue restaurant, and that appellant came out after him with a knife in his hand; that appellant overtook the deceased just after he got off of the side-walk; that deceased was trying to go away; that appellant overtook him and stabbed him with a butcher knife; that deceased had nothing in his hand at this time; that after appellant stabbed deceased appellant went back into the building; that when deceased was stabbed by appellant deceased grabbed his sides with his hands and came on across the street.

Albert Nance testified for the state that he remembers the occasion when the deceased was killed by appellant; that witness was standing on the platform of Mr. Osborn's feed store and saw deceased when he was put out of the house of appellant; when deceased was put out of the house of appellant he did not do anything except go back to the door to get his hat, and then attempted to go away; that deceased had walked about 20 to 25 feet from the door when appellant came out with a knife in his hand and stabbed deceased; that when deceased was stabbed he was walking away from the door; that after deceased was stabbed appellant went back into the house; that deceased had not offered any violence toward appellant at the time appellant stabbed him, and that if deceased had anything in his hands witness did not see it; that deceased was at least twenty feet from the door of appellant's house at the time appellant stabbed him.

Mrs. A. Arthur testified that she was at her husband's place of business when appellant stabbed deceased, standing in the

door and looking out; that she saw deceased come out of the door of appellant's place of business; that some one opened the door and threw deceased's hat out to him; that deceased picked up his hat and put it on his head, and started across the street; that after this witness saw appellant come out with a long knife in his hand; that appellant walked after deceased; that appellant overtook the deceased and struck him with a knife; that when deceased was struck with the knife he took two or three steps and took hold of his sides with his hands; that appellant then turned around and ran back into his house; that deceased was off of the sidewalk and on the street at the time he was stabbed by appellant.

Thereupon the state rested.

Ed Coffee testified for appellant that he was interested with appellant in running the barbecue restaurant; that he saw the deceased attempt to enter the door of the restaurant in a boisterous manner; that appellant said to deceased, "Come in"; that deceased replied, "What in the hell have you got to do with it"; that appellant replied, "Nothing, only I want to get out of the house"; that one word brought on another between them, and they began to fight; that deceased had appellant bent back over the counter, and finally they fell to the floor; that the parties were separated and deceased was put out of the house; that witness handed his hat out of the door to him; that deceased attempted to enter the house again; that appellant grabbed a knife off of the side shelf; that deceased and appellant then went together; that deceased then walked off.

Three other witnesses and appellant testified substantially to the same facts. Appellant also introduced a number of witnesses who testified that the deceased was a man of bad character as a violent and dangerous man. Appellant then introduced J. J. Slack, who testified that he was justice of the peace and acting coroner of Tulsa county, and as such justice of the peace and acting coroner of Tulsa county, and as such justice of the peace he held an inquest over the body of the deceased; that appellant was subpoenaed as a witness to attend said trial, and placed upon the stand and examined, and gave testimony as

to the manner in which the deceased came to his death; that counsel for appellant objected to appellant being sworn as a witness and placed upon the stand, which objection was overruled by the court.

R. L. Davidson testified that he was attorney for appellant, and represented him at the inquest held by the justice of the peace and *ex officio* coroner, and as the attorney of appellant he objected to his testifying, upon the ground that such testimony might incriminate him; that this objection was overruled by the justice of the peace, and appellant was placed on the stand and forced to testify.

*Davidson & Williams,* for appellant.

*C. J. Davenport,* Asst. Atty. Gen., for the State.

FURMAN, J. (after stating the facts as above). The only contention presented in behalf of appellant in the brief of counsel is that, when an inquest was being held to ascertain the cause of the death of the deceased, appellant was summoned as a witness by the justice of the peace, who was acting as coroner, and placed upon the stand and compelled to give evidence of the entire transaction which resulted in the death of the deceased; that all of this evidence was given over the objection of his counsel, and that thereby appellant had by said justice of the peace been granted immunity under the Constitution of the state.

The position of counsel for appellant is based upon the assumption that a justice of the peace has the power to grant immunity in murder cases. It is expressly provided by our statute that the court, either upon its own motion or upon the application of the county attroney, and in furtherance of justice, may order the dismissal of any indictment or information against a defendant, and that in such cases the reasons of the dismissal must be set forth in the order, and must be entered upon the minutes. See section 6099, Rev. Laws 1910. Section 6100 takes from the county attorney the common-law right of entering a *nolle prosequi* in any case, without the consent of the court. Section 6101 provides that, although the judge may order a case

to be dismissed, such dismissal is not a bar to any other prosecution for the same offense.

Discussing this question in the case of *Andy Scribner v. State,* 9 Okla. Cr. 465, 132 Pac. 933, this court said:

"If a county attorney cannot discontinue or abandon a prosecution for a public offense, except with the consent and approval of the court, and if a case can be renewed, and if such dismissal, though made with the approval of the court, does not bar another prosecution for the same offense, with what show of reason can it be said that a county attorney or any inferior tribunal can grant a defendant immunity, and absolutely bar a court of competent jurisdiction from prosecuting and punishing a criminal? Such a construction would enable a county attorney, or a justice of the peace, or a county judge, to absolutely bind the district court and conclude its action, which would often result in the defeat of justice. One illustration will demonstrate this: Suppose A. and B. engage in a mutual combat, in which each tries to kill the other. Suppose they are both arrested and have an examining trial before a committing magistrate, and such committing magistrate requires A. to testify against B., and then requires B. to testify against A. If such action is legal, then Both A. and B. would secure immunity. This would reduce the law to an absurdity, and defeat the very purpose which was had in view when it was adopted. But it may be said that, if a justice of the peace has the right to hold an examining court, he also has the right to enforce the attendance of witnesses, and compel answers to questions. Within reasonable bounds this is true. But if a justice of the peace permits illegal questions to be asked a witness, and attempts to force answers to them, and commits the witness for contempt for refusing to answer such questions, the remedy of the witness is by *habeas corpus.* See *Ex parte Gudenoge,* 2 Okla. Cr. 110, 100 Pac. 39. But if a witness answers illegal questions, and such answers are not voluntary, this would not grant the witness immunity, and such evidence could not be used against him in any other proceeding, because it would not be a voluntary statement freely made.

"While a justice of the peace, if there is no evidence against a party charged with murder, from which it appears that he is probably guilty, may discharge the defendant, certainly no one will contend that a justice of the peace can enter any order which would amount to an acquittal of a defendant charged with murder and prevent his subsequent prosecution. If he cannot do this

directly, but if a witness be allowed immunity on account of being compelled to answer questions in a justice court which may incriminate him, and on account of such answers receives immunity, it would be permitting a justice of the peace to do indirectly that which he cannot do directly. This' would be an absurdity upon its face. There is no logical escape from the conclusion that under our constitutional provisions and our statute immunity can only be secured by the action of a court having jurisdiction to finally try the matters with reference to which the immunity is claimed. In a trial before a justice of the peace he may compel a witness to answer questions which would incriminate such witness as to any matter within the jurisdiction of the justice of the peace for final trial; but beyond this he cannot go. If he could, he would have power to bind the county court, the superior court, the district court, and this court. In states in which a county attorney may enter a *nolle prosequi* without the consent of the court, he may grant immunity by contract without the approval of the court; but he cannot do so in this state. Under our system immunity is a judicial question which must be passed upon and decided alone by the court having jurisdiction to finally try the matters involved in the immunity claimed. If a witness has secured immunity by answering incriminating questions upon the order of a court of competent jurisdiction, or if a witness has an agreement with the prosecuting attorney approved by such a court, then this court will see that he is protected in his rights; but this court is not going to permit the doctrine of immunity to be used as an avenue of escape to guilty men, or as a cloak of protection for criminals."

We think that the decision in Scribner's case is decisive of the question now before us. Even if a justice of the peace in a regular trial has the power to compel a witness to answer incriminating questions as to matters beyond the jurisdiction of the court, appellant could not have received immunity in this case, because under section 1671, Rev. Laws 1910, it is expressly provided, "In no case shall the coroner hold any inquest, unless the cause of the death is unknown." In the case at bar the cause of the death of John Cox was well known. There was, therefore, not only no necessity for holding said inquest, but it was expressly prohibited by statute, and the justice of the peace had no power or jurisdiction to hold such inquest, and all of

his actions thereon are absolutely without jurisdiction and void. We are therefore of the opinion that the trial judge did not err in holding that appellant had not been granted immunity by an officer authorized to make such an order. This is a question for the court alone, and should never be submitted to a jury. See Scribner's case, *supra*.

There was a square conflict in the evidence in this case. The testimony for the state would have supported a conviction for murder. The testimony for appellant makes a plain case of justification, upon the ground that appellant was defending his place of business. The credibility of the witnesses was a question for the jury to determine. In finding appellant guilty of manslaughter in the first degree, the jury were probably influenced by the fact that the deceased was proven to be a man of bad character for peace, and the further fact that the instructions of the trial court were very liberal in behalf of appellant.

We find no material error in the record. The judgment of the lower court is in all things affirmed.

ARMSTRONG, P. J., and DOYLE, J., concur.