# GEORGE PRYOR v. STATE.

No. A-5268. Opinion Filed April 21, 1926.
(245 Pac. 669.)

W. N. Redwine, for plaintiff in error.

George F. Short, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DOYLE, J. Appellant, George Pryor, was convicted upon information charging him and one Lee Bryant jointly with the crime of robbery, committed with the use of firearms, and in accordance with the verdict of the jury he was sentenced to a term of 25 years in the state penitentiary.

In support of the contention of counsel for appellant that the judgment should be reversed and a new trial ordered, numerous errors are assigned. The following statement of the material facts will answer the purpose of our consideration of the appeal:

Reuben Jones, a colored man, conducted a small confectionary in the east part of the city of McAlester, and lived in the same building. On the 11th day of August, 1923, about 11:30 p. m., three men entered the front door of the store. One stood inside the door while the others robbed Jones of about $25. After committing the robbery, the two men ran out the door. Jones picked up a gun, and fired at the man standing inside the door, and he fell upon the floor. Jones followed with a Winchester rifle, and fired three or four more shots at the robbers while they were getting into a Ford car. About an hour later the sheriff was notified that two men were in a dying condition about four miles south of the city. Acting on this information he went there, and found Chester Pryor and Lewis Bryant mortally wounded. He called an ambulance, and brought them to All Saints Hospital at McAlester, where both died within two days.

It appears that appellant, George Pryor, Chester Pryor, his brother, Lee Bryant, and Lewis Bryant, his brother, were that day camped about four miles south of McAlester. The next day appellant and Lee Bryant were arrested at Atoka.

Reuben Jones testified that he was in his store about 11:30 p. m., and his wife was in the back room, when three fellows came in. One stood inside the door. The other two asked for sodas, and, as he turned around, one said "Stick them up," and hit him over the head with a pistol. The other reached to the cash drawer. His wife opened the back room door, and one of the robbers struck at her with a pistol, then pushed him into the back room, saying, "Don't

you move or I will shoot you." The other stood at the door all the time. When the two rushed out he picked up his gun and shot at the man at the door, and he dropped down on the floor, and he did not see him any more. That he followed them out the front door, and they commenced shooting, and rushed across to where a car was parked. Then he fired three or four more shots in their direction. That he only saw three men there. That the night before two men came into the store and appellant was one of them. That appellant was the man that stood guard inside the door. That they took from him $20 or $30 in silver and greenbacks.

His wife testified that she was in an adjoining room, and, hearing a racket, opened the door, and saw appellant standing inside the front door, and saw two men pushing her husband towards her. One of the men told her to get back in the room, and the other pushed her husband into the room. The other one took the money out of the drawer. That she saw her husband fire at the man standing inside the door.

The defense interposed was an alibi. It appears that the Pryor brothers and the Bryant brothers were driving from Muskogee to Dallas, Texas, where the Pryor brothers lived, in appellant's Ford car. When they reached McAlester they drove south about four miles, where they camped for a day. About sundown on the night of the tragedy Lee Bryant and his brother, Lewis, and Chester Pryor drove to the city. Appellant remained at the camp. They told appellant they would be back about 10 o'clock. When they did not return at that hour appellant waited a while, and then started towards the city, and when he reached the Jefferson Highway he saw some persons fixing a car, and they asked him if he knew anything about fixing their car. While he was working on this car, Lee Bryant and his brother and appellant's brother, came along, he called to

them, then got into his car and drove to the camp. The two boys that were shot were in a dying condition, and stated they got into trouble at McAlester. Appellant went to a farm house near by, and told the man about the boys' condition, and asked him to telephone for a doctor. The farmer telephoned for a doctor, and also telephoned the sheriff's office.

Pat Smythe testified that his mother lives near Atoka; met appellant several times in Dallas; was on his way from Muskogee to Dallas in Tom Parker's car with another fellow named Starks; that they reached McAlester about 10 o'clock, stopped there a while, and went on south, and had car trouble about three miles out; that, while they were working on the car, appellant came up, and he asked him if he knew anything about a Ford; that while they were there another car came by, appellant said, "I believe that is my car now," and called to them. They stopped, and some one in the car said, "Come on, George, quick." Appellant went to the car and got in, and that was the last he saw of him. They went on, and the other car turned into the side road.

J. S. Starks testified that he met Tom Parker and Pat Smythe in Muskogee, and arranged to go to Dallas with them on the morning of August 11th; they reached McAlester between 9 and 10 o'clock; were there about an hour; then went on south, and had car trouble about three and one-half miles out; that the first time he ever saw appellant he was coming up the road while they were trying to fix the car; that Smythe seemed to know him, and asked him what was the matter with the car, and he insisted on helping fix it. When Mr. Parker started the motor, a car came along, and appellant remarked that it sounded like his car, and he hollered. The car stopped; he walked over and got in; and the car turned down the side road.

As a witness in his own behalf, George Pryor testified that he was driving from Tulsa to Dallas, and with his

brother met the two Bryant boys at Muskogee. They wanted to go as far as Durant with him. On the evening of August 10th they camped about four miles south of McAlester, and about three-quarters of a mile off the Jefferson Highway. That he did not return to McAlester after they reached the camp. That the next day about sundown the three boys went to town. About 10:30 he walked up to the Jefferson Highway, and met a fellow he knew, Pat Smythe, who was having some car trouble. Two men he did not know were there. That after he helped to start the engine his car came by, and he hollered to the boys, and walked over to his own car. Lee Bryant told him that the boys were shot. That he took the wheel and drove on to camp. Then they took the boys out and put them on quilts. The boys told him that they had a shooting scrape with a negro, and asked him to get help for them, and then asked him to leave, saying they did not want him to be mixed up in the trouble; that he went to a farmhouse 150 yards from the camp, and had a man there 'phone for a doctor. The man said that when he called the doctor he would come and take care of the boys until the doctor got there. That with Lee Bryant in his car he drove to the Jefferson Highway, and headed south, and, after going some distance, the car ran into a ditch and turned over. That he changed his trousers and shirt, and left his coat there, and took his grip with him, and Lee Bryant left his grip there. That they walked on out past Savanna, and laid down to sleep, woke up, and went on to Kiowa, there took the train, and at Atoka the officers took them from the train.

Lee Bryant testified that as codefendant he pleaded guilty. That his age is 20 years, and his mother lived at Durant. That Chester Pryor and his brother, Lewis Bryant, went into the store, and he stopped at the door. Then Chester pulled a gun on this fellow Jones. That they left George Pryor at the camp about sundown and drove to the

city. On the way back George Pryor was standing by a car on the road. They stopped, and he got in, and they went on to the camp, and there took the wounded boys out of the car. That they told them to go on away and not get mixed up in the trouble. That they went to a farmhouse, and had a man there call a doctor, and then went on.

Cross-examination is as follows:

"Q. I will ask you, Lee, to read that statement and see if you made that statement? (Objection overruled.) A. I made the statement, but it was not true.

"Q. I will ask you, Lee, if on Sunday night following that robbery on Saturday night, if you made this statement in substance to Will Anderson and myself in the county jail? (Objection overruled. Exception allowed.) A. You told me you would get me out of it if I would plead guilty and furnish evidence against Pryor, you said you would get me a suspended sentence."

Whereupon the following statement was admitted in evidence and read to the jury by the county attorney:

"Chester Pryor, Lewis Bryant, George Pryor, and myself came down from Muskogee on Friday night, August 10, 1923. We went down there Friday night. Saturday morning we came to McAlester and got some groceries, and then went back to the camp out from Frink switch. About sundown Saturday evening we, Chester Pryor, Lewis Bryant, George Pryor, and myself, drove to McAlester and parked. We loafed around in McAlester until about 11 o'clock Saturday night. We then went out in the east end of town to nigger town to stick the Jones Confectionary up. We parked across the street from the Jones Confectionary. I stayed in the car. Chester Pryor, Lewis Bryant, and George Pryor went over to stick the man up. They were gone just a short while until I heard some shooting. Chester Pryor and Lewis Bryant crawled back to the car. We helped them in the car. I drove away for about two blocks. Then George Pryor drove on. We went back to the camp, and we stayed with Chester Pryor and Lewis Bryant until they were cold in death. They were going to die, and they asked us to go on and not to tell our mothers

about what had happened. George Pryor and I went and called a farmer, and told him to call the doctor and help, and then we left. We went south until the car turned over, and George Pryor and I walked to Savanna. We got something to eat south at Savanna at a store, and caught a ride into Kiowa, and caught the train at Kiowa, and we were taken off the train at Atoka and brought back.

"Dated this the 12th day of August, 1923.

"[Signed] Lee R. Bryant.

"Witness: Will Anderson."

The first error assigned by counsel on the record is based upon the opening statement of the case by the county attorney. The record shows that, after reading the information to the jury, the county attorney stated:

"The defendants have both been arraigned on the charge contained in this information, and Lee R. Bryant has entered his plea of guilty, and George Pryor entered a plea of not guilty.

"Mr. Redwine: Object to the statement of the county attorney that Lee R. Bryant entered a plea of guilty as being an improper statement to be made to the jury."

An admission by one of two persons charged with crime as to his own guilt is not evidence against the other. A confession, even though by a plea of guilty, is not admissible in evidence as such against any but himself. 1 Green. Ev. (13th Ed.) 233; Wharton, Crim Ev. § 699.

It follows that the statement was improper, and upon the objection made the court should have directed the jury not to consider the same. Another assignment of error is based on the admission of the statement or confession of Lee Bryant, codefendant, on his cross-examination. It is elementary that the confession of an accused is not admissible against him, unless it is a free and voluntary confession.

Involuntary confessions are rejected because they

"have no just and legitimate tendency to prove the fact admitted, hence they are not competent for any purpose." Com. v. Morey, 1 Gray (Mass.) 461.

Mr. Russell says:

"But a confession in order to be admissible must be free and voluntary. That is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence, because under such circumstances the party may have been influenced to say what is not true and the supposed confession cannot safely be acted upon." 3 Russell on Crimes, book V, c. 4, § 1.

Mr. Joy says:

"The object with which the law admits a confession in any case in evidence is to obtain truth. The only ground on which a confession is rejected is that the circumstances under which it was obtained have a tendency to falsehood; and therefore the object with which it is admitted, instead of being secured, is likely to be frustrated. If any hope or fear acts upon the mind of the prisoner, and induces him to make an untrue confession, such confession is more likely to defeat than to secure the ends of justice." Joy on Confessions, 51.

The general rule that the credibility of a witness may be impeached by proof that he has made statements relevant to the issues out of court, contrary to what he has testified to at the trial, does not apply to involuntary confessions. The weight of authority is that it is error to use an incompetent confession as a basis for cross-examination.

In State v. Rogers, 39 P. 219, 54 Kan. 683, it was held that—

"The admissions or confessions of an alleged coconspirator with the defendant in the commission of crime, made after the offense had been fully consummated, and the criminal design fully carried out, are inadmissible on the separate trial of the defendant for any purpose."

In the case of Shephard v. State, 59 N. W. 449, 88 Wis. 185, Chief Justice Orton, delivering the opinion of the court, says:

"The confession is just as objectionable as evidence, and as incompetent and hurtful, when offered in one way as in another. If no other evidence on the ground of contradicting the defendant as a witness could be found, he had better have gone uncontradicted than that his legal rights as a prisoner should be so violated, and his conviction obtained by such unlawful testimony. The object is to get the confession in evidence. It cannot be done directly, but it can be done indirectly. It cannot be used to convict, but it can be used to contradict, the defendant and in that way it is used to convict him all the same. We cannot adopt such a principle or practice in the administration of criminal law. It is unreasonable as well as unjust. This evidence was inadmissible on the familiar ground that a witness cannot be cross-examined and contradicted in respect to matters not admissible in evidence as part of the case. Whart. Cr. Ev. 484."

That the statement or confession of the codefendant in this case was not voluntary is undisputed. That its admission was prejudicial cannot be doubted. The complaining witness testified that the robbery was perpetrated by three men; that when he fired the fatal shots he only saw three men at the car parked across the street. Two of those men were killed, and the third, codefendant in this case, pleaded guilty. There was no evidence offered in the case showing that four men participated in the robbery other than the statements made in this confession. The court did not instruct the jury that the statement was not a free and voluntary confession, and that it must not be considered by them in determining the question as to the guilt or innocence of the defendant on trial, or that this codefendant's confession, even though by a plea of guilty, was not admissible in evidence as such against the defendant on trial. The er-

ror in its admission, therefore, cannot be said to have been cured by the instructions of the court.

We deem it unnecessary to consider the other assignments of error. As a new trial must be granted because of the admission of the incompetent testimony above referred to, there is no occasion for us to determine whether the verdict was against the weight of the evidence.

For the errors indicated, the judgment appealed from is reversed.

The warden of the penitentiary will surrender appellant, George Pryor, to the custody of the sheriff of Pittsburg county, who will keep him in custody until discharged therefrom according to law.

BESSEY, P. J., and EDWARDS, J., concur.