# STANTON SKEEN v. STATE.

No. A-9152.    April 5, 1937.

(66 Pac. [2d] 1106.)

Kelly Brown, R. M. Mountcastle, and Jean R. Reed, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and E. J. Broaddus, Co. Atty., for the State.

BAREFOOT, J.   The defendant was charged by information in Wagoner county with the crime of manslaughter in the first degree.   He was charged with killing one Tildon Tehee, 64 years of age, a full-blood Cherokee Indian, on July 9, 1935; it being charged in the information as follows:

"* * * Did strike, hit and beat, with the fists of him, said Stanton Skeen, and with said hard, blunt weapons, held in said fists, the same being dangerous weapons, as aforesaid, the said Tildon Tehee, in the face, neck, and head of him, the said Tildon Tehee, knocking said Tildon Tehee through said door, then and there open and ajar, and onto and against the ground, which was rough and rocky, the head and shoulders of said Tildon Tehee, striking said ground heavily and with great force, whereupon said Stanton Skeen, having moved from said automobile and onto the ground, and one Levi Peyton raising from the ground said Tildon Tehee, unable to stand alone, and with his hands holding and supporting said Tildon Tehee in an upright position, again strike, hit and beat with the fists of him, the said Stanton Skeen, and with said hard blunt weapons, held in said fists the said weapons being dangerous weapons as aforesaid, the said Tildon Tehee, in the face, neck and head of him, the said Tildon Tehee, knocking said Tildon Tehee from said support of said Levi Peyton again, onto and against the said rough and rocky ground heavily and with great force, the said Stanton Skeen inflicting by his striking, hitting and beating, again and again, the said Tildon Tehee, as aforesaid, and by his knocking said Tildon Tehee, onto and against said rough and rocky ground, as aforesaid, lacerations, bruises and abrasions on the face, neck, head, back, legs,

arms and body of said Tildon Tehee, and concussions of the brain of the said Tildon Tehee, and rupture of the blood vessels of the brain of said Tildon Tehee, and a fracture of the skull of said Tildon Tehee, of which said lacerations, bruises, abrasions, concussion of the brain, rupture of the blood vessels of the brain and fracture of the skull, the said Tildon Tehee did die."

The defendant was found guilty by the jury, and his punishment assessed at ten years in the penitentiary.

The deceased was found dead on a country road in the northeast part of Wagoner county on the 9th day of July, 1935. He had some marks of violence on his body which medical authorities testified might have produced death. The testimony revealed that defendant was a farmer and lived about eleven miles north of Wagoner, in Wagoner county; that he had a Cherokee wife and four children; that prior to the 8th of July, 1935, he had employed one Levi Peyton to do certain work for him on his farm; that Peyton was a married man who had formerly lived in that part of the country, but was then living at Dodge City, Kan., and had returned to visit his father who lived near the defendant. On the afternoon of July 8th, defendant and Levi Peyton went to Wagoner in a car belonging to said Peyton, the defendant having some business to transact there. They arrived in Wagoner after the banks closed; while there they bought two pints of whisky and drank it and before leaving bought a half gallon of corn whisky. Later in the afternoon they met two Indian girls on the street whom defendant knew. He talked with them about doing some work for his wife and made arrangements to take them back home in the car. After midnight July 8th, the two girls, defendant, and Peyton left Wagoner starting toward home. They drove a few miles out of Wagoner and had a flat tire. One of the girls had become so drunk she vomited on the hat

of defendant, and this caused them to return to Wagoner, so defendant could have his hat cleaned before his wife saw it. While there they bought another half gallon of corn liquor and started home. While crossing a small ravine the car stopped and the girls got out of the car and started to walk to their home. This was about 6:30 in the morning of July 9th. Some time after this the deceased, Tildon Tehee, came along. He was carrying an axe and saw. Levi Peyton talked to him, the defendant being in the back seat of the car. The witness Peyton gave him a drink of the corn liquor and he agreed to help push the car. They could not get the car started, and defendant told them to get some one to push it and he would pay for it. Witness went for help, but at first did not find any one and returned to the car and the deceased took another drink. Witness again went for help and got a man with a couple of mules, and he pulled the car out and got it started. They went about a half mile and stopped, where the defendant and deceased again took another drink of the corn liquor. They then drove up to a gate which was very close to where deceased lived and while sitting in the car deceased said, "I am sure feeling good, I would like another drink," and he and defendant took another drink. Up to this time there had been no hard words and nothing to indicate any difference between defendant and deceased, according to the testimony of Levi Peyton, the only party with them. The defendant was riding in the front seat and deceased was in the back seat. The record does not show why deceased rode in the car after they had been pulled out. The only reason seemed to be that they had corn liquor in the car which he desired. While sitting in the car both defendant and deceased, who were evidently drunk at this time, according to the testimony of Levi Peyton, began to argue

about the wife of defendant; deceased claiming that defendant was spending his wife's money recklessly. Peyton, the only eyewitness, testified as follows:

"A. And then Stanton asked the Indian something about somebody getting a check and the Indian asked him if he got his wife's check and Stanton said he did and they got to squabbling over some money.

"Q. Just tell what they said and what they did. A. They got to talking about Lulu's check.

"Q. Who is Lulu? A. That is Stanton Skeen's wife.

"Q. All right. A. And this Indian told Stanton that all he did was spend her money and Stanton told him he could take care of his own money, and I don't know what the Indian said, he said something in Cherokee and Stanton said, 'She is nothing but a squaw and all she can do is cook and work,' and this Indian said, 'Yes but you can blow her money in,' and I saw they were going to fight and Stanton struck him.

"Q. Where was Stanton then? A. He was in the front seat by the side of me.

"Q. Where was the Indian? A. He was in the back seat.

"Q. What happened then? A. Well I saw they were going to fight and I got out of the car and the Indian acted like he was going to get out.

"Q. Could you tell where Stanton hit the Indian? A. He hit him somewhere in the face.

"Q. You got out of the car on which side? A. On the left side.

"Q. And the car was facing east? A. Yes, sir.

"Q. Then what happened? A. Well, I stepped out of the car and when I got out of the car I heard the Indian say, 'Sonabitchee.'

"Q. Where was the Indian then? A. He was crawling over the front seat on my side and I looked back and when I looked back Stanton hit him again.

"Q. Where did he hit him? A. He hit him in the back of the head somewhere.

"Q. What happened then? A. The Indian fell out on the ground on his head and shoulders.

"Q. Then what happened? A. I reached down and got hold of him by his arm and helped him up and Stanton scooted out of the car and went to crying and said he would kill any son-of-a-bitch over his mother.

"Q. How did he get out of the car? A. He scooted out of the seat under the steering wheel and came out on the left side and went to crying.

"Q. When he got out of the car where were you and the Indian? A. I took hold of the Indian's arm and helped him up and then Stanton hit him again.

"Q. Could you see where he hit him then? A. He hit him in the back of the head somewhere; I had my back to him and couldn't see where he hit him.

"Q. What did the Indian do? A. He staggered off a couple of steps and fell down.

"Q. Then what took place? A. I said, 'Let's pick him up and take him to the house,' and Stanton got back in the car and said, 'Let him lie there and he will sober up and go to the house,' and Stanton said, 'Come on, let's go,' and we got in the car and left."

This all happened between 8:30 and 9 o'clock on July 9, 1935. The witness and defendant then drove home and later in the day, with their wives and the children of defendant, drove to Wagoner and returned home that night; the witness next morning returning to his home in Dodge City, Kan., not knowing of the death of deceased until he was arrested there and put in jail and afterwards

brought back to Wagoner county. He was afterwards used as a witness by the state in this case.

A witness by the name of Stute Sequoyah, an Indian, testified that the deceased was living at his home and that he left there on the morning of July 9, 1935, for the purpose of chopping wood, and testified that when he returned home on the afternoon of that day about 5 o'clock, he found the body of the deceased lying on the ground at a gate about two hundred yards from his house. He was dead at that time.

The testimony showed that it was one of the hottest days of the summer of 1935. Upon the discovery of the body a doctor was called and arrived there after dark, at about 8:30 o'clock. The material part of the doctor's testimony was as follows:

"Q. What did your examination show? A. The principal thing was a contusion of the neck, a wound on the neck, one on his right wrist I think and a bruise on his side, on the side of his chest.

"Q. Were there any bruises about the face? A. There was a skinned place on his forehead but I wasn't able to determine whether it was just a slipping of the skin or what; I don't know whether that bruise occurred before death or afterwards.

"Q. Which bruise was that? A. The one on the forehead.

"Q. The wound on the neck, which side was that on? A. On the right side.

"Q. About how large was that? A. Well the skin was knocked off about the size of a quarter nearly.

"Q. Could you tell whether that had been made before death? A. Yes sir, that one I could tell it occurred before death; it had bled some and was dry.

"Q. State whether or not, in your opinion, that wound was caused by a bare fist or by a blunt weapon or instrument. A. It must have been some kind of an instrument; a bare fist would hardly do that; it could have been, but it knocked the skin off any way.

"Q. How about the wound on the right wrist? A. The skin was knocked off and it had bled a little.

"Q. Could you say whether or not that had been made before death? A. Yes, sir, it was made before death.

"Q. The body, was it lying near the road? A. It was in the section line right near the road.

"Q. Did you notice the road along there as to whether it was rocky or not? A. No, sir; I didn't pay much attention to it.

"Q. You couldn't tell whether or not the bruise on the side was made before death or not or the one on the forehead? A. The one on the forehead I couldn't tell but the one on the side had the appearance of having been made before death.

"The Court: Q. Was that underneath the clothing? A. Yes, sir; just a bruise.

"Mr. Broaddus: Q. About what age would you say the deceased was? A. Apparently about 60 or 62, just guessing at it.

"Q. How long had he been dead, in your opinion, when you saw him? A. Ten or eleven hours is the best I could tell.

"Q. Assuming he had been dead about ten or eleven hours and the blow on the neck had been inflicted about 9:00 or 9:30 that morning, what, in your opinion, was the cause of his death? A. My opinion was that the wound caused his death; that was my own opinion.

"The Court: Q. The bruise on his side, was the skin broken there? A. I don't think it was.

"Q. That bruise or abrasion which suggested some application of external force, could that have been caused by a fist or would it take some blunt instrument to do that? A. Well it could have been caused by either one.

"Mr. Broaddus: That's all.

"Cross-examination by Mr. Brown:

"Q. Was Mr. Hersman there with you when you made your examination? A. Yes, sir.

"Q. At that time you didn't know anything about the manner in which he had received his wounds? A. No, sir.

"Q. You just looked at the body? A. Yes, sir.

"Q. And this wound in the right side under the right arm, was the most severe wound? A. No, sir; the one on the neck was the most severe.

"Q. That was on the right side of the neck? A. I think so.

"Q. Did you make any post-mortem or did you go just by your observations of the wounds? A. That's all. I felt there was a necessity of making a post-mortem but the body was so decomposed that it wouldn't be a very pleasant job and I didn't find any instruments there to make the examination with.

"Q. A post-mortem would have revealed the cause of death much more accurately? A. Yes, sir.

"Q. Without a post-mortem it was just partly guess work? A. Yes, sir; partly guess work.

"Q. A post-mortem would have revealed whether or not the injury to the neck or side had brought about his death or whether the heat had had something to do with it? A. Yes, sir; it probably would have.

"Q. If he had died on account of there being such a high humidity that day and such a high temperature— the humidity that day was about 80? A. I don't remember what it was.

"Q. But if he had died on account of the temperature and the humidity a post-mortem would have or might have shown a different result than if he had died by wounds? A. Yes, sir, it might have but the only way you could have determined if he had died of the heat you would have to make a lot of laboratory examinations to do that but a post-mortem would have revealed any haemorrhage in the brain.

"Q. But the blow or injury to the neck, if that had produced death it would have produced a haemorrhage? A. Possibly a haemorrhage in the brain, yes, sir; his neck wasn't broken.

"Q. And the first thing to look at to determine the cause of his death would be to make an examination of his brain? A. Yes, sir, that would be the best.

"Q. That would give you the most satisfactory answer as to the result of the injury? A. Yes, sir; it possibly would.

"Q. Did you know the deceased personally? A. No, sir.

"Q. Assuming that a man 65 years of age and who on that occasion or about 8:00 or 9:00 o'clock that morning had drank considerable liquor, four drinks or more of corn whisky and then had engaged in some physical exercise like pushing a car, trying to start it, and taking into consideration the heat and the humidity that day, and knowing all of those things and then finding the deceased had died about the time you concluded that he did, would it be reasonable to conclude that he died from the effects of those things, that is, from the effect of the heat and the humidity and the physical exercise and the liquor and also considering his age? A. Yes, sir; that could be possible.

"Q. In a person of that age and the combination of strong drink and strong physical exercise, would it be reasonable to conclude that those things had caused his death? A. Yes, sir; it sometimes occurs that way.

198

"Q. Has your experience shown you occasions like that or do you know of occasions like that? A. Well, I don't know if I could answer that that way or not but all those things could have had an influence on it.

"Q. You know from your medical files don't you, that the combination of the elements of heat and humidity and liquor and physical exercise will sometimes cause or produce heat prostration? A. Yes, sir; it will produce heat prostration.

"Q. That time of the year in this climate is the most common time for heat prostrations? A. Yes, sir.

"Q. And the element of strong liquor adds to that? A. Yes, sir.

"Q. And strong exercise like pushing a car is a further element to be considered, is it not? A. Yes, sir: it is.

"Mr. Brown: I believe that is all.

"Redirect examination by Mr. Broaddus:

"Q. Assuming that you saw the deceased about 8:00 or 8:30 that evening and that he was alive about 9:00 or 9:30 and that whatever exercise he had done before that was done about 8:30 or 9:00 o'clock, as much as a half hour or at least 15 or 20 minutes before that and he was alive at 9:00 or 9:30, then in your opinion, was the cause of his death the blow or injury he received or was it due to heat prostration? A. I would believe that it would be due to the effects of the blow.

"Mr. Broaddus: That's all.

"Recross-examination by Mr. Brown:

"Q. If you had made a post-mortem examination you could be much more certain about that? A. Yes, sir; I could be.

"Q. Did the county attorney request a post-mortem? A. I don't remember, but I believe he did.

"Q. You know of another heat prostration on that same day don't you? A. I heard of it."

Witnesses Lillie Pumpkin and Luella Henson testified that they lived at the home of Stute Sequoyah and that deceased lived there also; that after breakfast on the 9th of July, the deceased left home for the purpose of cutting wood. The two girls afterwards went to Wagoner and came home that night with the defendant and the witness Levi Peyton. They corroborate the testimony of Levi Peyton in practically every respect up to the time of their getting out of the car and walking home about 6:30 in the morning. One of the girls testified that she saw the automobile drive up to the gate about 8:30 or 9 in the morning and saw the defendant and deceased drinking whisky and saw the defendant strike the deceased. She said she was looking out of the window and that it was about 200 yards away. The defendant, testifying in his own behalf, corroborated the evidence given by the witness Levi Peyton up to the very time of the difficulty. He testified that at the time he was so drunk that he had no recollection as to what happened and had no recollection of striking the deceased and knew nothing about it until the next day when the officers came to take him before the coroner's jury.

Upon the question of intoxication as a defense, this court has in many opinions discussed this question giving the authorities, not only from the various states, but from the Supreme Court of the United States, and the leading text-writers. These cases distinguish between voluntary and involuntary intoxication and insanity caused by constant intoxication, and as the court expresses it: "Intoxication cannot operate as an entire exemption from criminal responsibility, and it is not conclusive against the existence of a criminal intent. At the utmost it only

extenuates the crime from murder to manslaughter, and it does not do this as matter of law. Whether the accused was so intoxicated as to render him incapable of entertaining the specific intent necessary to constitute the crime is a question of fact for the jury." See Cheadle v. State, 11 Okla. Cr. 566, 149 Pac. 919, 922, L. R. A. 1915E, 1031; Collier v. State, 17 Okla. Cr. 139, 186 Pac. 963, 12 A. L. R. 839; Copperfield v. State, 37 Okla. Cr. 11, 255 Pac. 590; Huffman v. State, 24 Okla. Cr. 292, 217 Pac. 1070; Perryman v. State, 12 Okla. Cr. 500, 159 Pac. 937.

The evidence in this case shows that the deceased came to his death by reason of a drunken brawl. The evidence clearly shows that the defendant and deceased were drunk at the time of the difficulty. The quarrel between them came up about nothing; there was no ill will nor malice on the part of either of them. The only eyewitness, Levi Peyton, did not see any instruments being used by the defendant in striking deceased. He used only his bare fists.

The testimony of the doctor was uncertain as to the effect the wounds on the body of the deceased would have in producing death, and there seemed to be a doubt in his mind as to whether deceased came to his death from blows or from the effects of the sun's rays and the whisky that the deceased had drunk. He did testify, when asked as to his opinion as to what caused the death, that: "* * * My opinion was that the wounds caused the death. That was my own opinion." The evidence showed that no post mortem was held in this case and the doctor's testimony that a post mortem would have shown whether deceased came to his death by reason of the blows.

The statute of this state, section 2223, Oklahoma Statutes 1931 (21 Okla. St. Ann. § 711), defines "manslaughter in the first degree," as follows:

"Homicide is manslaughter in the first degree in the following cases:

"First. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

"Second. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

"Third. When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed."

Applying the above statute, and after a careful consideration of the record in this case, and the fact that the jury has passed upon the same and found the defendant guilty, it is our opinion that justice would be done by modifying the judgment to the minimum punishment provided for manslaughter, that of four years. There was a sharp conflict in the testimony as to the state of intoxication of the defendant at the time of striking the deceased. The jury saw the witnesses and heard the testimony, and while it is not strong, especially as to whether the deceased died as the result of the blows inflicted by the defendant or from the effects of drinking intoxicating liquor and lying in the hot sun, yet we believe that the ends of justice have been met by the reduction of this penalty as above indicated. Three witnesses testified that the defendant was drunk, two of them seeing him just before he went to the place where deceased was found and one seeing him just after he had left there.

We have carefully examined the authorities cited by defendant upon the proposition that the court erred in admitting incompetent testimony by permitting the state

202

to offer the coroner and certain persons who were on the coroner's jury, and allowing them to testify in rebuttal to testimony given by the defendant. While the verdict of the coroner's jury might not have been admissible, as shown by the authorities cited, New York Life Insurance Company v. Gibbs, 176 Okla. 535, 56 Pac. (2d) 1179; Spiegel's House Furnishing Co. v. Industrial Commission, 288 Ill. 422, 123 N. E. 606, 6 A. L. R. 540, we think, however, that these cases do not cover the point involved in this case. The evidence here was offered in rebuttal of that given by the testimony of the defendant, and the authorities hold that evidence thus given in rebuttal is clearly admissible. See 28 Ruling Case Law, 640; Pollard v. State, 201 Ind. 180, 166 N. E. 654, 84 A. L. R. 779; Hollywood v. State, 19 Wyo. 493, 120 Pac. 471, 122 Pac. 588, Ann. Cas. 1913E, 218; People v. Devine, 44 Cal. 452; People v. Smith, 134 Cal. 453, 66 Pac. 669.

The courts are not in harmony as to whether this evidence is admissible when offered by the state as a part of its evidence in chief, but as rebuttal testimony we think under the law the evidence was properly admitted.

It is therefore ordered that the judgment in this case be modified and the sentence reduced to four years in the penitentiary, and as modified the judgment is affirmed.

DAVENPORT, P. J., and DOYLE, J., concur.