# W. M. WILLIAMSON v. STATE.

No. A-9334.  March 25, 1938.
(77 P. 2d 1193.)

W. E. Rice, of Ponca City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and O. B. Martin, Co. Atty., of Newkirk, for the State.

BAREFOOT, J. An information was filed in Kay county charging defendant with the crime of murder. He was tried and convicted of manslaughter in the first degree, and was sentenced to serve 21 years in the penitentiary. From this judgment and sentence he has appealed.

Defendant, in his brief, relies upon two assignments of error:

"First: That the constitutional guaranty and right of the defendant that 'No person shall be compelled to give evidence which will tend to incriminate him * *' was violated, and

"Second: That thereby the defendant did not have a fair trial and has been denied substantial justice."

Both of these propositions may be considered together. The record in this case reveals that one Thad Tucker ran a barbecue stand in Ponca City, and that Amos Keath was working for him; that Nathaniel Kelley was running a beer garden in the same city, which was known as "Dixie Hill," and where various gambling games were being carried on; that defendant, W. M. Williamson, was working for Nathaniel Kelley at his place of business; that in the early morning hours of September 17, 1936, Thad Tucker left his place of business in company with Amos Keath and Gerald Wood, going to the place known as "Dixie Hill," where defendant was working. Several of the parties played at various gambling games, and finally a poker game was started in an adjoining room. Nathaniel Kelley, Amos Keath, Gerald Wood, and the defendant were in this game. All of the parties were negroes, with the exception of Gerald Wood, who was dealing the cards. In dealing one of the hands all of the parties had laid down their hands except Nathaniel Kelley and Amos Keath, when a dispute arose with reference to permitting the cards to be cut; Nathaniel Kelley stating that the cards had been crimped by Gerald Wood the dealer, and demanding that they be cut, and Amos Keath contended that they should not be. This dispute grew

to such an extent that it broke up the game. It seems that Keath took the money that was on the table and Nathaniel Kelley left the place and went to his home and secured a pistol for the purpose of returning and demanding of Amos Keath that he give him his money back. While this argument was going on, the defendant left the room where the card game was being conducted, and went behind the bar in the adjoining room, and started to take a pistol from a drawer. He was asked by Thad Tucker, "Let's not start anything," but a little later placed the pistol in his pocket, and went to the front door of the building as he says for the purpose of going across the street to phone for the officers. Just prior to this Nathaniel Kelley had returned with his gun and met Amos Keath in the street and said to him, "I want my money back that I bet on the game;" that he had his gun in his hand at the time. Amos Keath replied, "Well here is the money," and held it out in his hand, and as Kelley reached for it Keath grabbed his gun and in the scuffle that ensued Keath threw Kelley down, and as he did so the gun fired into the ground. Keath secured possession of Kelley's gun. The defendant testified that he heard the report of the gun and stepped to the front porch, and started to step off of the porch, and that the first thing that he noticed, Keath was standing in the street facing him, and said to the defendant, "Put down that gun," and defendant said, "Put down your gun," and immediately the shooting started. The evidence does not disclose which of the parties shot first. The defendant himself testified he did not know who fired the first shot. Defendant shot five times, and Keath emptied his pistol. He ran about a block, where he fell and, as the result of the shot fired by defendant, died. The evidence showed that the shot which killed deceased entered the back and lodged near the heart. The defendant returned to the beer joint, reloaded his gun, and came back to the front porch. The defendant was immediately arrested and placed in the city jail. He was held in custody until a coroner's inquest was held on the after-

noon of the same day by the county attorney of Kay county. An attorney appeared at the city jail and asked permission to interview the defendant, which was denied by the chief of police on instructions of the assistant county attorney. It was stated at the trial by the county attorney that the attorney who appeared at the jail did not represent defendant, but told him that he was only interested in Nathaniel Kelley, whom it seems had also been arrested and was being held in jail. At the coroner's inquest defendant was placed upon the witness stand and testified, and his evidence was taken down in shorthand and transcribed. The county attorney stated that he informed the attorney that the coroner's inquest was going to be held, and that he told him he was only interested in Nathaniel Kelley. At the coroner's inquest the defendant was not informed of his constitutional rights with reference to giving his testimony, but made no objection to testifying. It might here be said that the testimony given by defendant at the coroner's inquest and that given by him at the trial of the case was substantially the same. The court, in the absence of the jury, heard statements of attorneys and refused to permit the evidence offered at the coroner's inquest to be admitted by the state, stating in his opinion it was an involuntary statement of defendant. When defendant was placed on the witness stand, the court permitted the county attorney to cross-examine defendant with reference to the statements made at the coroner's inquest, and to introduce as a part of his cross-examination of defendant certain questions and answers asked defendant at the coroner's inquest. The permitting of the introduction of this evidence on cross-examination of defendant is the principal error relied upon by defendant for a reversal of this case. In support of this contention he cites the following cases: Harrold v. Oklahoma, 8 Cir., 169 F. 47, 17 Ann. Cas. 868, reversing the same case reported in 18 Okla. 395, 89 P. 202, 10 L.R.A., N.S., 604, 11 Ann. Cas. 818; Scribner v. State, 9 Okla. Cr. 465, 132 P. 933, Ann. Cas. 1915B, 381; Faucett v. State,

10 Okla. Cr. 111, 134 P. 839, L.R.A. 1918A, 372; Pryor v. State, 34 Okla. Cr. 131, 245 P. 669; Skeen v. State, 61 Okla. Cr. 188, 66 P. 2d 1106, 1112.

At the trial of the case at bar, the county attorney produced the decision of the territorial court in the Harrold Case, but it was not known that this case had been reversed by the Circuit Court of Appeals at that time. While this court is not bound by the decisions of the federal courts, our respect for the ability and the soundness of the decisions of those courts would cause us to give great weight to the law as announced by them. We have carefully read and reread the opinion of Judge Burford of the territorial Supreme Court, and the opinion of Judge Sanborn of the Circuit Court. We think that a clear distinction is to be drawn between the facts in that case and the facts in the instant case. In the Harrold Case, the cross-examination of the witness was permitted with reference to certain alleged "confessions" made by the defendant, which were procured by a promise of prosecuting officers that certain leniency would be granted the defendant and certain cases against him dismissed if he would sign a confession. It was held that by reason of these circumstances this was an "involuntary" statement. The same was true in the Faucett Case. In the case at bar, defendant was called as a witness and testified voluntarily, notwithstanding the statement of the trial court that in his opinion it was an involuntary statement. Under the authorities it was a voluntary statement. Snyder v. State, 59 Ind. 105; Davidson v. State, 135 Ind. 254, 34 N.E. 972; Clough v. State, 7 Neb. 320; Green v. State, 124 Ga. 343, 52 S.E. 431; People v. Mollineux, 168 N.Y. 264, 61 N.E. 286, 62 L.R.A. 193; State v. Gilman, 51 Me. 206. Involuntary statements are ones that are extracted by any threats of violence, or obtained by direct or implied promises, or by the exertion of improper influence. There is nothing in the record in this case to show that any inducement of any kind was offered defendant. He made no objection to the giving of his testimony. It was

not against his interest, but was practically the same as offered by himself at the time of the trial. Under the evidence of the defendant himself, the jury would have been warranted in finding him guilty. His evidence clearly showed a case of mutual combat. There was no question of involuntary confession in this case. The law presumes that a party who is called upon to testify as a mere witness knows his rights. He may decline to testify to anything that may tend to incriminate him. This the defendant could have done had he chosen to claim his privilege. Having failed to do so, he cannot now complain.

There was a time when a defendant was not permitted to testify in his own behalf, and because of the denial of this right the courts in the early days rightfully established the rule that a confession made by a person could not be used against him if the same was secured by fear, under duress, or through promises of leniency or immunity. The admission, in order to be introduced, should have been made voluntarily. The reason for the rule was based upon the fact that defendant, not being permitted to testify in his own behalf, was therefore not permitted to deny or explain the statements that were attributed to him. Now the defendant is permitted to testify the same as other witnesses if he desires to do so. The reason for the former rule no longer exists. There is no sound reason why a defendant who voluntarily becomes a witness in his own behalf should not be subjected to the same rule applied to other witnesses with reference to cross-examination. He should weigh the consequences and determine the result before he goes upon the witness stand. If he is unable to withstand the cross-examination by reason of statements he has made, or evidence he has given at a former hearing, it is his privilege to not present himself as a witness and be subjected to cross-examination. It therefore follows that the constitutional rights of the defendant have not been violated while on cross-examination, to interrogate him with reference to

statements or evidence which he has given, where such statements or evidence tends to impeach or discredit him.

As before stated, the statement made by the defendant at the coroner's inquest was practically the same statement made at the trial of the case. Many of the questions had reference to the conduct of defendant when he left the poker game and procured the pistol. Other questions were with reference to when he pulled his gun from his pocket after going on to the porch. His statements at the inquest and on the trial were about the same. Very little material difference. The cross-examination with reference to the time of the actual shooting was as follows:

"Q. Let me ask you this question, Willie; did you see Amos Keath and Kelley having their scuffle out there? A. No, sir. Q. I will ask you if you were asked this question at the coroner's inquest: 'Did you see Amos and Kelley have their tussle over a gun?' And you answered: 'Yes.' A. No, sir. Q. You were not asked that question and didn't make that answer? A. No, sir. Q. I will ask you if you were asked this question: 'You heard a shot?' And you answered, 'Yes, I looked around and he said, put your gun down, and I said, put yours down.' A. Yes, I heard a shot when I was going off of the porch and had a hold of that post on the side of the porch, and stepped down, I heard a shot and I looked around and saw somebody running and I just looked on around to see who it was shot, and I saw Keath had his gun on me, and I pulled my gun out of my pocket, and he said, 'Put your gun down,' and I said, 'Put yours down.' Q. I asked you if you were asked this question? 'You heard a shot?' And you answered, 'Yes, I looked around and he said put your gun down, and I said, put yours down.' A. Yes. Q. You gave that answer? A. Yes."

While there is a clear distinction to be drawn from the facts in the Harrold Case and the case at bar, if we were adopting a rule to be adhered to by this court, we think the rule as announced by Judge Burford of the territorial Supreme Court is supported by the authorities and the better reason. An examination of the authorities cited, and especially the decisions of the Supreme Court of the United

States, are in harmony with the rule that, when a defendant takes the witness stand in his own behalf, he waives his constitutional privilege of silence, and that the prosecution has the right to cross-examine him upon his evidence in chief the same as any ordinary witness, and to the same extent. Sawyer v. United States, 202 U. S. 150, 26 S. Ct. 575, 50 L. Ed. 972, 6 Ann. Cas. 269; Fitzpatrick v. United States, 178 U. S. 304, 20 S. Ct. 944, 44 L. Ed. 1078; Asher v. Territory, 7 Okla. 188, 54 P. 445; Hyde v. Territory, 8 Okla. 69, 56 P. 851. While there is a conflict of opinion, the American courts generally hold to the rule that this cross-examination should be confined to the matters connected with and relating to the subjects about which the witness has been examined in chief. Yet the rule has been liberally construed so as to allow facts to be inquired into which are reasonably connected with or will tend to affect the testimony in chief, or which will tend to affect the character or credit of the witness. Rea v. Missouri, 17 Wall. 532, 21 L. Ed. 707. The other cases cited, when carefully read, do not sustain the contention of the defendant, but rather support the rule as announced herein. The Skeen Case, which is also cited by the state, passes upon the identical question here involved. In that case a coroner's inquest was held, and defendant, before any complaint had been filed against him, testified, as did the defendant in this case. When he testified at the trial, the state, on cross-examination, was permitted to contradict his testimony by evidence given by him at the coroner's inquest. This was held permissible; the court holding:

"We have carefully examined the authorities cited by defendant upon the proposition that the court erred in admitting incompetent testimony by permitting the state to offer the coroner and certain persons who were on the coroner's jury, and allowing them to testify in rebuttal to testimony given by the defendant. While the verdict of the coroner's jury might not have been admissible, as shown by the authorities cited, New York Life Insurance Company v. Gibbs, 176 Okla. 535, 56 P. 2d 1179; Spiegel's House

Furnishing Co. v. Industrial Commission, 288 Ill. 422, 123 N.E. 606, 6 A.L.R. 540, we think, however, that these cases do not cover the point involved in this case. The evidence here was offered in rebuttal of that given by the testimony of the defendant, and the authorities hold that evidence thus given in rebuttal is clearly admissible. See 28 Ruling Case Law, 640; Pollard v. State, 201 Ind. 180, 166 N.E. 654, 84 A.L.R. 779; Hollywood v. State, 19 Wyo. 493, 120 P. 471, 122 P. 588, Ann. Cas. 1913E, 218; People v. Devine, 44 Cal. 452; People v. Smith, 134 Cal. 453, 66 P. 669.

"The courts are not in harmony as to whether this evidence is admissible when offered by the state as a part of its evidence in chief, but as rebuttal testimony we think under the law the evidence was properly admitted."

We have carefully read the decisions above quoted and find that the rule there announced is in harmony with the rule announced by practically all of the courts. An elaborate note discussing this identical question and citing cases from many states is found in 70 L.R.A. 33. A careful reading of those cases reveals that as stated in the Skeen Case there is some conflict of authority as to the admissibility of evidence taken at a coroner's inquest as a part of the state's evidence in chief, but at page 43 of the note it will be noted that the decisions are practically unanimous that for the purpose of impeachment or rebuttal the evidence is admissible. Jones v. State, 120 Ala. 303, 25 So. 204; Woods v. State, 63 Ind. 353; State v. Van Tassel, 103 Ia. 6, 72 N.W. 497; Steele v. State, 76 Miss. 387, 24 So. 910; State v. Punshon, 133 Mo. 44, 34 S.W. 25; Rounds v. State, 57 Wis. 45, 14 N.W. 865; People v. Hong Ah, Duck, 61 Cal. 387; Tuttle v. People, 33 Colo. 243, 79 P. 1035, 70 L.R.A. 33, 3 Ann. Cas. 513; Garrett v. St. Louis Transit Co., 219 Mo. 65, 118 S.W. 68, 16 Ann. Cas. 688.

Defendant in his brief insists that no coroner's inquest should have been held in this case; that, by reason of Okla. Stats. 1931, § 4179, Okla. St. Ann. tit. 19, § 466, p. 193, an inquest should not be held unless the cause of the death is unknown, and cites the case of Faucett v. State, 10 Okla.

Cr. 111, 134 P. 839, L.R.A. 1918A, 372, as upholding this contention; that in the instant case the cause of the death of Amos Keath was known, and the purpose of the county attorney in holding the inquest was for the purpose of securing the testimony of the defendant. If this be true, we desire to express our disapproval of this practice. The statute provides that an inquest shall not be held "unless the cause of the death is unknown," and the statute should be obeyed. The record does not reveal why the coroner's inquest was held in this case. It seems to us that a preliminary examination should have been held and the county attorney could have there secured the information necessary for the purpose of filing a proper information. At this preliminary examination defendant could have, if he desired, had counsel to have advised him as to his constitutional rights. However, from a consideration of all the facts in this case, we do not believe the fact that a coroner's inquest was held when it should not have been would justify a reversal of this case. This defendant seemed to have adopted the theory that by reason of his employment by Nathaniel Kelley it became his bounden duty to enter into any difficulty which Kelley might have. The dispute between Kelley and Keath was no part of his, yet he armed himself and at the very first opportunity entered the difficulty demanding of Keath that he "put down his gun," and when he refused to do so fired immediately. The deceased was shot in the back and the bullet lodged near the heart. He seemed to have adopted the principle if there is going to be a fight I have just got to get into it. Human life cannot be sacrificed in this way. A good and lawful jury of his home county has said he must pay the penalty. The instructions of the jury have been examined, and they covered the law of the case in an able manner fully protecting the rights of the defendant. There were no exceptions to the instructions of the court.

No error has been committed which would justify us in interfering with this verdict, and the judgment of the district court of Kay county is therefore affirmed.

DAVENPORT, P. J., and DOYLE, J., concur.